## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: CHOCOLATE | : | MDL DOCKET NO. 1935 |
| CONFECTIONARY ANTITRUST | : | (Civil Action No. 1:08-MDL-1935) |
| LITIGATION | : | |
| _____ | : | (Judge Conner) |
| | : | |
| THIS DOCUMENT APPLIES TO: | : | |
| | : | |
| ALL CASES | : | |

## <u>MEMORANDUM</u>

This multidistrict matter arises from defendants' alleged attempts to fix prices for chocolate confectionary products in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs contend that defendants, who control approximately 75% of the U.S. chocolate candy market, conspired to inflate prices artificially and reaped windfall profits as a result of several coordinated price increases implemented between 2002 and 2007.

All defendants filed motions to dismiss (Docs. 464, 469, 476) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007). A subset of defendants comprised of Cadbury plc, Cadbury Holdings Ltd. ("Cadbury Holdings"), Mars Canada, Inc. ("Mars Canada"), Nestlé S.A., and Nestlé Canada, Inc. ("Nestlé Canada") also challenged the court's personal jurisdiction under Rule 12(b)(2). (<u>See</u> Docs. 466, 471, 473, 474.) These defendants (hereinafter collectively "the Rule 12(b)(2) defendants") allege that they do not engage in business in the United States, maintain no presence here, and are therefore beyond the court's jurisdictional ken. On March 3, 2009, the court deferred ruling on these issues and granted plaintiffs a period of limited discovery

to develop a factual basis for jurisdiction over the Rule 12(b)(2) defendants.

See In re Chocolate Confectionary Antitrust Litig. (Chocolate I), 602 F. Supp. 2d 538, 573-74, 577 (M.D. Pa. 2009).  Discovery closed on April 24, 2009, and all parties to the Rule 12(b)(2) motions submitted supplemental briefs and accompanying exhibits.  For the reasons that follow, the jurisdictional motions of Mars Canada, Nestlé S.A., and Nestlé Canada will be granted; the motions filed by Cadbury plc and Cadbury Holdings will be denied.

## I.    **Factual Background**[1]

The Rule 12(b)(2) defendants share many characteristics pertinent to the jurisdictional analysis.  None of the Rule 12(b)(2) defendants own real property in the United States, none of them have bank accounts here, and none of them maintain a stateside workforce.  They do not sell chocolate or other products directly to American consumers, and they do not have manufacturing facilities within U.S. borders.  Nevertheless, plaintiffs contend that their ties to the United States place them within the court's jurisdictional reach.  It is to these contacts that the court now turns.

---

[1]The court recited the allegations of plaintiffs' amended complaints (Docs. 418, 420, 422, 448) at length in Chocolate I, familiarity with which is presumed.  The court will recount facts alleged in the complaints only insofar as necessary to dispose of the Rule 12(b)(2) defendants' jurisdictional challenges.

## A.    Mars Canada

Mars Canada is an indirectly owned operating subsidiary of defendant Mars, Inc. ("Mars Global") that manufactures and distributes Mars-branded products in Canada.  (Doc. 622, Ex. 2 at 68-69, 83; Doc. 622, Ex. 33.)  It employs more than 460 individuals, all of whom work in Canada.  (Doc. 622, Ex. 2 at 93-94; Doc. 622, Ex. 11.)  Mars Canada is required to obtain the approval of Mars Global for its annual budget, for capital expenditures in excess of $500,000, and for executive appointments and compensation packages.  (Doc. 622, Ex. 2 at 153-55, 159; see also Doc. 622, Ex. 17 §§ 2.9.1, .4; Doc. 622, Exs. 27-31, 34-35.)

Mars Canada periodically transfers its profits to Mars Global or to other Mars entities in the U.S. through dividend payments or through an asset-transfer process known as "capital repatriation."[2]  (Doc. 622, Ex. 2 at 82, 86.)  Either Mars Global or Mars Canada may initiate dividend payouts, but Mars Global originates capital repatriation without input from Mars Canada.  (Id. at 84, 96.)  In either form of transfer, the entities' officers negotiate the precise amount of the transaction based upon the corporations' respective financial positions.  (Id. at 82-84.)  These discussions allow Mars Canada to influence the amount and timing of transfers, and the two entities typically confer until officers of both organizations "feel comfortable" with terms of the dividend or repatriation.  (Id. at 83.)  Mars Global

_____

[2]Capital repatriation refers to the process by which a corporation transfers an asset from one country to another and revalues it using the transferee nation's currency.  See JOHN DOWNES, BARRON'S FINANCIAL GUIDES: DICTIONARY OF FINANCE AND INVESTMENT TERMS 580 (7th ed. 2006).

also collects periodic financial data from operating subsidiaries pertaining to sales, revenue, finance, and business planning.  The Mars Recurring Reports Manual, which governs submission of forty-four different reports, standardizes the format in which subsidiaries must submit this information.  (Doc. 622, Ex. 24.)

 Mars Canada extends credit to other Mars entities and assumes debt without approval from its parent.  (Doc. 622, Ex. 2 at 31, 100-01, 104.)  While it may not distribute products outside of Canada, it develops marketing campaigns, sets the price for chocolate candy sold to Canadian buyers, and contracts with third-party distributors independent of its remote corporate parent.  (Id. at 118-19, 129-30, 161-62, 206; see also Doc. 622, Exs. 11-13; Doc. 628, Ex. 2 ¶ 14.)

Mars Canada owns all of the trademarks that it utilizes in the Canadian market, and it has entered trademark licensing agreements with Wendy's International, DreamWorks LLC, and Unilever Ice Cream.  (Doc. 622, Ex. 2 at 125; Doc. 622, Exs. 11-13.)  The Wendy's and Unilever agreements allow these entities to incorporate Mars-branded confections into the food products they market, (Doc. 622, Ex. 11 ¶¶ 3-4; Doc. 622, Ex. 13 ¶¶ 2.1, 3.1, 3.5, at 1607-09),[3] while the contract with DreamWorks authorizes Mars Canada to use Shrek® trademarks on its product packaging.  (Doc. 622, Ex. 12 at scheds. II & III, at 1545-49, 1554-55.)

---

[3]The DreamWorks and Unilever agreements consist of an original licensing contract and several addenda.  The court will cite these documents by paragraph number followed by the last four digits of the Bates stamp identifier on the page(s) that contains the cited provisions.

Approximately 15% of the chocolate candy Mars Canada produces is consumed by Canadian households, generating annual revenue of approximately C$200 million.[4] (Doc. 622, Ex. 2 at 35, 60.) Mars Canada sells the remaining 85% of its chocolate products to Mars entities in foreign nations at rates below the prices paid by Canadian distributors. (Id. at 35, 61.) These transactions generated an average of C$77.7 million annually between 2002 and 2007. (Doc. 622, Ex. 1.) Most of these exports enter the U.S. market through an inter-company sale to defendant Mars Snackfood U.S. LLC ("Mars Snackfood"),[5] which distributes Mars-branded products to American consumers. (Doc. 622, Ex. 2 at 36.) Mars Snackfood takes possession of these products F.O.B. Canada, and both corporations log the transfer as a purchase transaction in their accounting journals. (Id. at 41-42, 56.) Pricing for this transfer is guided by the Mars Finance Manual, a 500-page document issued by Mars Global that establishes uniform accounting, finance, purchasing, and litigation practices throughout the Mars group.[6] (Id. at 47-48; Doc. 622, Ex. 17

---

[4]All monetary figures preceded by a dollar sign ($) appear in U.S. dollars unless otherwise noted. Amounts preceded by a *C* reflect valuation in Canadian dollars.

[5]Mars Canada corporate designee Mary Jane Dowling identified the American entity that purchased Mars Canada's products as "Snackfood" or "U.S. Snackfood," but she was unable to identify its precise legal name. (Doc. 622, Ex. 2 at 36.)

[6]As used in this memorandum, the terms "Mars group," "Nestlé group," and "Cadbury group," refer respectively to Mars Global, Nestlé S.A., and Cadbury plc and all of their affiliated operating, holding, and managing corporations regardless of whether the subsidiaries are parties to this action.

§ 1.3.1.)  The Manual articulates broad pricing principles, but the parties to an inter-company transfer must determine how to apply them to a particular transaction. (Doc. 622, Ex. 17 § 2.21.2 (instructing parties to "jointly seek to resolve any queries related to the application of [pricing] guidelines")).

Mars Snackfood and other Mars entities[7] within the United States supply Mars Canada with certain proprietary raw materials.  These materials consist primarily of liquid chocolate and chocolate crumb—a base ingredient for all Mars-branded chocolate products.  (Doc. 622, Ex. 2 at 113-15.)  Mars Canada and Mars Snackfood also consolidate their purchases of supplies such as packaging and packing materials.  (Id. at 116-17.)

**B.      Nestlé S.A. and Nestlé Canada**

Nestlé S.A. is the ultimate parent of all entities within the Nestlé group, which includes fifty-two operating companies that bear primary responsibility for product sales and distribution.  (Doc. 618, Ex. 2 at 11, 71, 75.)  The Nestlé group loosely coordinates operating activities through two immediate subsidiaries of Nestlé S.A. known as Nestec, S.A. ("Nestec") and Société des Produits Nestlé S.A. ("Société").  (Id. at 13, 62; Doc. 627, Ex. A ¶ 6.)  Like Nestlé S.A., both Société and Nestec are formed under Swiss law and have their corporate headquarters in Vevey, Switzerland.  (Doc. 618, Ex. 37 at 183.)  They employ no personnel, hold no

---

[7]As used herein, the terms "Mars entity," "Nestlé entity," or "Cadbury entity" refer to an indeterminate member of a particular corporate group regardless of whether it is a party to this action.

real property, and maintain no bank accounts in the United States.  (Doc. 618, Ex. 2 at 287-88; Doc. 642, Ex. 2 at 4.)

Société holds legal title to many Nestlé trademarks while Nestec owns the patents and technical know-how used to produce Nestlé-branded products.[8]  (Doc. 618, Ex. 2 at 13, 62; Doc. 618, Ex. 15 at 31; Doc. 618, Ex. 23 at 37.)  Nestec provides product design and manufacturing support to Nestlé operating entities, and it serves as the primary research and development arm of the Nestlé group.  (Doc. 618, Ex. 2 at 62, 65; Doc. 618, Ex. 15 at 87-88; Doc. 619, Ex. 37 at 182-83.)  Nestlé S.A. is the beneficial owner of all intellectual property ("IP") held by Société and Nestec, which license it to Nestlé operating entities.  (Doc. 618, Ex. 2 at 13, 22.)  In return, Nestlé operating entities remit royalty payments to Nestlé S.A.  (Id.; Doc. 618, Ex. 23 at 37-38.)

Regional intellectual property advisors ("RIPAs") act as liaisons between Nestec and Société and local operating entities.  (Doc. 618, Ex. 2 at 46-48.)  Each RIPA is employed by a Nestlé operating entity but simultaneously reports to the entity's executives and to Nestec or Société.  (Id.)  The RIPAs provide advice to

---

[8]It is unclear whether a bright line separates the functions of Société from those of Nestec.  Hans Peter Frick ("Frick"), the corporate designee for Nestlé S.A., testified that Société holds a "large majority" of patents for which Nestlé S.A. is the beneficial owner.  (Doc. 618, Ex. 2 at 21-22.)  He later explained that Nestec—rather than Société—serves as the custodian of the Nestlé group's patent assets.  (See Doc. 627, Ex. A ¶ 12).  Terrence J. Ellwood, Nestlé Canada's corporate designee, testified that Nestec rather than Société owns many of the trademarks under which Nestlé operating companies distribute products.  (Doc. 619, Ex. 37 at 30, 182.)  For purposes of this memorandum, it is sufficient to note that Société and Nestec jointly administer the Nestlé group's intellectual property assets.

operating companies about trademark issues and apprise Nestec or Société of current developments in local trademark strategy. (Id.) This arrangement allows the Nestlé group to maintain centralized trademark oversight while granting operating companies control over the marks they use on a day-to-day basis. (Id.) The Nestlé group collectively employs approximately twenty RIPAs, who are based around the globe. (Id. at 48-49; Doc. 627, Ex. A ¶ 15.)

Although Nestlé S.A., Société, and Nestec operate in Switzerland, they are not strangers to the American confectionary and investment markets. Société has licensed its Kit-Kat® and Rolo® trademarks to defendant The Hershey Company ("Hershey Global"), which produces candy under these brand names in the United States. (Doc. 618, Ex. 8.) The agreement requires Hershey Global to remit periodic royalty payments to Société, (id. ¶ 4(f)), to provide Société with product samples on a monthly basis, (id. ¶ 4(e)(iii)), and to allow Société to inspect its facilities annually, (id.).

Senior executives from Nestlé S.A. frequently travel to the United States to conduct investment road shows[9] and cultivate investor relations. (Doc. 618, Exs. 11, 12; Doc. 619, Exs. 35, 40.) They attended at least fifty-four events and made hundreds of trips to the U.S. between 2005 and March 2009. (Doc. 619, Exs. 21, 35.) Nestlé S.A. also participates in acquisition activity and joint ventures in the United

---

[9]A road show is a series of meetings or presentations during which corporate representatives meet with potential investors for the purpose of soliciting capital. See Credit Suisse Sec. (USA) LLC v. Billing, 551 U.S. 264, 270 (2007).

States, though it frequently implements such actions through subsidiary corporations. (Doc. 618, Ex. 2 at 93-94, 121-22, 223-31.) During the past two decades, the Nestlé group has acquired controlling interests in many American companies, such as Dreyer's®, Gerber®, Purina®, and Jenny Craig®. (Id. at 215, 218, 231; Doc. 619, Ex. 40 at 22.)

The Nestlé group manages products, brand images, and operations through structures known as strategic business units ("SBUs") and the strategic generating demand unit ("SGDU"). (Doc. 618, Ex. 2 at 75.) SBUs are constructed around product lines rather than along geographic or corporate boundaries, and separate SBUs exist for each group of closely related products, such as confectionary, frozen foods, and pet care products. (Id. at 65; Doc. 618, Ex. 15 at 90.) Each SBU engages in transnational product development and facilitates the sharing of expertise among Nestlé entities that produce similar goods. (Doc. 618, Ex. 2 at 65.) The SBUs also bear primary responsibility for maintaining the integrity of a portfolio of trademarks known as strategic marks.[10] Supervisory authority for all but one of the SBUs rests with Nestec,[11] (Doc. 627, Ex. A ¶ 13), though Nestec's SBU personnel ultimately report to a Nestlé S.A. employee, (Doc. 618, Ex. 2 at 223).

---

[10]The record does not delineate the parameters that the Nestlé group uses to distinguish strategic marks from other trademarks; however, it appears that strategic marks are those assigned to large families of products, such as Nescafé®. (Doc. 618, Ex. 2 at 61, 78.)

[11]The pet care SBU falls under the authority of an entity known as Nestlé Purina Petcare Global Resources. (Doc. 627, Ex. A ¶ 13.)

Whereas SBUs focus on product development and trademark fidelity, the SGDU devotes itself primarily to marketing and sales. It designs promotional campaigns, conducts market research, and develops strategies for product placement. (Doc. 627, Ex. A ¶ 14.) SGDU staff members collaborate with the SBUs and with the management of Nestlé operating entities to market products in a manner that appeals to consumers within local geographic markets. Operating entities may then either incorporate the strategies developed by the SBUs and SGDU or may reject the marketing proposals if they conclude that the measures are ill-suited to their particular regions. (Doc. 618, Ex. 2 at 233-34.)

Operating companies communicate financial information to Nestlé S.A. via an internet-based system known as GLOBE. (Doc. 618, Ex. 15 at 40.) The system, which Nestlé S.A. launched in 2000, provides a common platform accessible to all members of the Nestlé group. (Doc. 619, Ex. 34 at 20; Doc. 619, Ex. 37 at 83.) It aggregates financial, marketing, sales, and supply data from all quadrants of the group, and group entities use it for a multitude of corporate functions, from cataloguing financial data to analyzing supply chain efficiency. (Doc. 618, Ex. 2 at 196; Doc. 619, Ex. 34 at 20.) Nestlé Globe, Inc., a subsidiary of Nestlé Canada, employs the information technology staff who run GLOBE on a daily basis. (Doc. 619, Ex. 37 at 84.)

Notably, however, Nestec, and Société do not directly supervise the manufacturing, sales, and marketing processes, which are functions that remain the responsibility of operating entities such as defendant Nestlé USA, Inc.

("Nestlé USA"). (Doc. 618, Ex. 15 at 21.) Nestlé USA is the exclusive supplier of Nestlé-branded products in the United States. (Id. at 194-95.) It has promulgated a strategic business plan that identifies products tailored to the American market and focuses upon developing brand identity with American consumers. (Doc. 618, Ex. 19 at 25-32.) Nestlé USA administers this plan sans involvement from Nestlé S.A., Nestec, or Société. It has created SBUs and an SGDU for purposes analogous to, but distinct from, their similarly named Nestec counterparts. (Doc. 618, Ex. 15 at 90, 147-49.) The SBUs and SGDU within Nestlé USA direct their efforts exclusively toward the American market, and Nestlé USA is organized around somewhat different product clusters. (Id. at 147-49.) Nestlé USA formulates a budget independently of Nestlé S.A., though it must submit monthly financial information to Nestlé S.A., (id. at 53, 189, 216-20), including management letters, which delineate product sales and identify immediate challenges to distribution and market growth, (id. at 70-80; Doc. 618, Exs. 16-18.)

Nestlé USA regularly exchanges products with sister corporation Nestlé Canada. It sells Nestlé Canada nearly all of the frozen food and nutritional snack bars that the latter distributes. (Doc. 619, Ex. 37 at 120, 128, 191-92.) Nestlé Canada purchases raw materials from American vendors and "Nestlé Business Services," an entity that supplies raw materials to Nestlé operating companies in the United States and Canada. (Doc. 618, Ex. 15 at 180-81; Doc. 619, Ex. 37 at 63; Doc. 619, Ex. 39). Commerce also flows southward. Between 2004 and 2008 Nestlé Canada sold chocolate turtles to Nestlé USA and Coffee Crisp®, Aero®, and other

confectionary products to American companies outside the Nestlé group. (Doc. 619, Ex. 37 at 225-34.) Both Nestlé USA and Nestlé Canada are members of the Nestlé group's Zone Americas, an entity within Nestlé USA that sets sales targets and establishes prices for product transfers between Nestlé entities within North and South America. (Doc. 618, Ex. 15 at 51, 100-01, 223-24.) Nestlé Canada also acquires products from third-parties in the U.S. pursuant to co-packing agreements. (Doc. 619, Ex. 37 at 209-10.) These arrangements allow American companies to manufacture Nestlé-branded products, which Nestlé Canada then purchases for Canadian distribution. (<u>Id.</u>)

### C.     <u>Cadbury plc and Cadbury Holdings</u>

Cadbury plc and Cadbury Holdings are both British corporations with their principal offices in Uxbridge, United Kingdom. Cadbury plc is the ultimate parent of all entities within the Cadbury group, and Cadbury Holdings is its sole immediate subsidiary. (Doc. 620, Ex. 3 at 12.) Both corporations are the successors in interest of Cadbury Schweppes plc ("Cadbury Schweppes"), which dissolved in May 2008. (Doc. 521, Ex. F; Doc. 620, Ex. 3 at 9.) Cadbury Holdings succeeded to Cadbury Schweppes's corporate governance functions while Cadbury plc assumed responsibility for investment and public reporting obligations. (Doc. 521, Ex. F; Doc. 620, Ex. 3 at 9, 12.) Cadbury plc and Cadbury Holdings possessed identical directors following the dissolution of Cadbury Schweppes but have since diversified their board membership, and none of the directors of one entity presently holds a concurrent position with the other. (Doc. 620, Ex. 3 at 14, 70.) Cadbury plc shares

and American depository receipts ("ADRs") appear on the London and New York Stock Exchanges.  (Id. at 9.)

Todd Stitzer ("Stitzer"), the CEO of Cadbury plc, manages the affairs of Cadbury subsidiaries through a panel known as the Chief Executive Officer's Committee (hereinafter "CEC" or "the Committee").  (Doc. 521, Ex. B; Doc. 620, Ex. 5.)  Despite his title, Stitzer is actually an employee of a U.S.-based Cadbury entity, as Cadbury plc has no employees.  (Doc. 620, Ex. 3 at 16-17.)  The CEC assumes responsibility "for the day-to-day management of the operations and the implementation of strategy,"[12] (Doc. 521, Ex. B), and consists of the heads of the Cadbury group's various business units, which serve purposes similar to the Nestlé group's SBUs.  (Doc. 620, Ex. 4 at 56.)  However, Cadbury business units differ significantly from Nestlé SBUs in that their principals concurrently serve as the executives of Cadbury operating entities.  (Doc. 620, Ex. 3 at 17.)  The chief executives of Cadbury operating entities are not only responsible for their own

---

[12]According to the Cadbury website, which the court independently reviewed, the board of Cadbury plc has promulgated "terms of reference which define [the] roles and responsibilities" of various committees within the Cadbury group.  See Cadbury Global, Our Responsibilities, http://www.cadbury.com/ourresponsibilities/ corporategovernance/Pages/corporategovernance.aspx (last visited Aug. 6, 2009). The terms of reference for the CEC vest the Committee with authority "[t]o review and manage major operating issues which arise in the ordinary course of business," "[t]o review and manage matters relating to the supply chain, including procurement, . . . and supply chain capability development," and "[t]o approve agreements . . . or other documents which may be necessary . . . to implement or carry out decisions or policies of the Board of Directors."  See Cadbury plc, Chief Executive's Committee Terms of Reference, http://www.cadbury.com/SiteCollection Documents/Chief%20Executive%20Committee%20Terms%20of%20Reference.pdf ¶ 7(e), (g), (m) (Dec. 5, 2008).

company's manufacturing activities, they are also responsible for management of Cadbury global operations through the CEC. The CEC convenes between six and nine times annually. (Doc. 620, Ex. 4 at 59-60.) Between 2006 and 2007, at least three of these meetings occurred in the United States. (Doc. 620, Exs. 32, 33, 39.)

Jim Chambers ("Chambers") is a member of the CEC and serves as president and CEO of Cadbury Adams USA LLC ("Cadbury USA"), the Cadbury entity responsible for product manufacturing and distribution in the United States. (Doc. 620, Ex. 5; Doc. 629, Ex. 2 ¶ 1.)[13] According to Chambers, employees of the Cadbury group perceive Cadbury plc and Cadbury Holdings as a single, undifferentiated entity.[14] (Doc. 620, Ex. 4 at 26-27.) The two companies share office space, (Doc. 620, Ex. 3 at 17-18), and manage the Cadbury group through a matrix organizational structure, (Doc. 620, Ex. 4 at 54). Dual reporting lines are the primary attribute of a matrix organization. (Id. at 54; Doc. 629, Ex. 1 ¶ 7.) Under

---

[13]The exhibits submitted by Cadbury plc and Cadbury Holdings contain three affidavits, each of which precede a series of alphabetically marked exhibits. The court will cite the affidavit of John Mills as Exhibit 1, the affidavit of Jim Chambers as Exhibit 2, and the affidavit of Stacy Kaplan as Exhibit 3. The attachments to each affidavit will be identified as Exhibits 1A-1O, 2A-2H, and 3A-3B, respectively.

[14]Chambers testified as follows:

Q.   For people like you, who work in the business and run things
     day-to-day, do you have any understanding of the distinction
     [between Cadbury plc and Cadbury Holdings]? I'm not asking
     form a legal perspective, I'm asking from a practical perspective,
     between Cadbury Holdings Limited and Cadbury plc.
A.   No.

(Doc. 620, Ex. 4 at 26-27.)

this structure, managers of Cadbury operating entities supervise employees within their chain of command and simultaneously share information with their peers from other geographic territories.  Global functional heads coordinate this sharing of information.  (Doc. 620, Ex. 4 at 56-57; Doc. 629, Ex. 1 ¶ 7.)  Thus, the matrix structure promotes global development of group-wide expertise and best practices within each functional area.  (Doc. 620, Ex. 4 at 56-57; Doc. 629, Ex. 1 ¶ 7.)

Part and parcel of the Cadbury group's matrix structure is a process known as "seconding."  This process allows the CEC and other group managers to transfer personnel from one Cadbury entity to another.  The CEC periodically reviews personnel assignments and recommends intercompany transfers—or "secondments"—based upon operational needs.  (Doc. 620, Ex. 4 at 192.)  The transferred individual becomes an employee of the transferee entity but retains benefits and seniority that he or she accrued while working for the transferor company.  (Doc. 629, Ex. 1 ¶ 5.)  The transferee entity must approve the seconding and may reject the proposed transfer.  (Doc. 620, Ex. 4 at 194.)  If the individual is a contract employee, his or her contract remains in effect following the secondment; however, the transferee entity assumes responsibility for the individual's compensation package.  (Doc. 620, Ex. 3 at 21; Doc. 629, Ex. 1 ¶ 6.)  Since 2000, thirty-five employees based in the United Kingdom have been seconded to Cadbury entities in the United States, twenty-two of whom formerly worked for Cadbury Schweppes plc.  (Doc. 620, Ex. 2.)  Thirty-one individuals have transferred in the

opposite direction, with twenty-three destined for the ultimate parent company. (Id.)  The remaining secondments occurred among other Cadbury entities.  (Id.)

Cadbury plc and Cadbury Holdings are directly involved in their subsidiaries' budgeting procedures.  Each fiscal year, local operating companies propose budgets and sales targets, which they forward to Stitzer and the chief financial officer ("CFO") of the Cadbury group.  (Doc. 620, Ex. 4 at 48-49, 132-33.)  Stitzer and the CFO review and approve all budgets and establish sales targets for the operating companies. (Id.)

The Cadbury group maintains two licensing agreements with Hershey Global.  These agreements[15] grant Hershey Global an exclusive license to produce

---

[15]The licensing agreements reflect a two-stage effort by the Cadbury group to exit the American chocolate candy market in the late 1980s.  The first phase came on July 22, 1988 in the form of an asset purchase agreement between the predecessor of Hershey Global, Cadbury Schweppes plc, and Cadbury Schweppes, Inc., a Delaware corporation (hereinafter "Cadbury Delaware"). (Doc. 478 at 14.)  This agreement established terms for the transfer to Hershey Global of Cadbury-owned physical assets in the United States, including facilities, equipment, and inventory.  (Doc. 478 at 12.)  The agreement mandated that Hershey Global receive a license to manufacture and distribute Cadbury-branded products at the time of the closing.  (Doc. 478-2 §§ 3.1-.2, at 4.)  The second phase of the Cadbury withdrawal occurred on August 25, 1988, when the two licensing agreements were executed as required by the asset purchase contract.  The first licensing agreement, executed between Hershey and an operating company known as Cadbury Limited, governed many products marketed under the Cadbury brand name, such as Caramello®, Creme Eggs®, and Dairy Milk® chocolate bars. (Doc. 620, Ex. 22 sched. A.)  In early 2008, Cadbury Limited became Cadbury UK Limited, an operating company that presently supplies chocolate candy to the United Kingdom market.  (Doc. 620, Ex. 3 at 69-70.)  The second agreement, executed between Hershey Global and Cadbury Delaware, authorized Hershey Global to produce products marketed under the Peter Paul® and York™ brands. (Doc. 478-7 at 21-22.)  Cadbury Schweppes plc was not a party to either of the trademark agreements.

and distribute Cadbury-branded products in the United States.  (Doc. 478-7 § 2.1, at 27; Doc. 620, Ex. 22 at § 2.1, at 10.)  In return, Hershey Global pays periodic royalties to the Cadbury entities that are signatories to the agreement.[16]  (Doc. 478-8 § 5.1, at 12-13; Doc. 622, Ex. 22 § 5.1, at 36.)  None of those entities are parties to this litigation.

Managers of Hershey Global and these entities meet quarterly to discuss marketing strategy, product development, and quality control.  (Doc. 478-8 § 6.1, at 18-19; Doc. 620, Ex. 22 at § 6.2, at 42-43; see also Doc. 620, Exs. 25-26.)  Between 2004 and 2008, the parties to the agreement conducted at least ten quality-review inspections at three manufacturing plants that produce Cadbury-branded products.[17]  (See Doc. 620, Exs. 25-26.)[18]  The inspections addressed issues such as packaging, production improvements, quality assurance, and marketing of Cadbury-branded products.  (Id.)  Cadbury plc and Cadbury Holdings (and Cadbury Schweppes) have never participated in these conferences, though as corporate

_____

[16]Both agreements require Hershey Global to direct royalty payments to the contract signatory or the signatory's designate.  (Doc. 478-8 § 5.1, at 12-13; Doc. 622, Ex. 22 § 5.1, at 36.)  The record does not reflect the current designate(s).

[17]Jane Heathcock ("Heathcock") and Trevour Kelleher ("Kelleher") participated in these inspections on behalf of the Cadbury group.  (Doc. 620, Exs. 25-26.)  The record does not identify which Cadbury entity employs these individuals or the extent of their interaction with personnel then retained by Cadbury Schweppes.

[18]Plaintiffs have submitted a total of fifteen quality review documents, some of which are duplicative.

parents of the Cadbury group they obviously benefit from royalties generated by the licensing agreements. (Doc. 620, Ex. 3 at 73.)

Plaintiffs have also submitted minutes from two additional conferences convened for purposes beyond those specified in the trademark licensing agreements. The first, held on January 28, 2005 and styled "Hershey/Cadbury Joint Review Session," was attended only by employees of U.S. and Canadian Cadbury entities.[19] The conference explored opportunities for joint procurement of raw materials and supplies, the possibility of sharing cocoa futures pricing data, and cooperative production between Hershey Global and Canadian Cadbury entities. (Doc. 620, Ex. 23.) The minutes contain the following notation regarding pricing: "CS to develop pricing for Hershey skus[20] sourced from Gladstone," (Id. at 4), which is a manufacturing facility operated by Cadbury Canada. (Doc. 620, Ex. 4 at 165.)

---

[19]Eight employees of the Cadbury group attended this meeting. (Doc. 620, Ex. 23 at 1.) Three of these individuals, Bill Herbes, Leo Valle, and Ron Anderson, were members of the Cadbury Americas Confectionary business unit, which consists of all Cadbury operating entities in the United States and Canada. (Doc. 620, Ex. 4 at 155, 159-60.) Meeting minutes reflect that one individual, David Reilly, represented "operations Canada." (Doc. 620, Ex. 23 at 1.) One attendee, Stan Ainsley ("Ainsley"), was originally employed in the U.K. by Cadbury Beverages Ltd. but had been seconded to the Americas Confectionary unit at the time of the meeting. (Doc. 620, Ex. 2 at 1.) The record does not indicate the affiliation of the other three attendees.

[20]SKU, an acronym for "Stock Keeping Unit," is a unique identification number assigned to products for purposes of inventory management. See Incase, Inc. v. Timex Corp., 488 F.3d 46, 50 n.2 (1st Cir. 2007).

The second conference occurred on December 15, 2005. It focused on opportunities to streamline quality control and auditing procedures under the trademark licensing agreements. (Doc. 620, Ex. 24.) The record again contains no indication of involvement by employees of Cadbury Schweppes. During the meeting, Hershey Global expressed a desire to grow its international market share but stated that it had no intentions of expanding its presence in Europe. (Id. at 1.) Plaintiffs postulate that the minutes of this conference reveal an agreement "that Hershey would stay out of Cadbury's home market [in Europe] in exchange for the continued allocation of Cadbury's share of the U.S. Chocolate Candy market to Hershey via the licensing agreements." (Doc. 620 at 22.)

D. **Procedural History**

The court initially deferred ruling on the Rule 12(b)(2) defendants' motions and granted plaintiffs a period of jurisdictional discovery, which closed on April 24, 2009. See Chocolate I, 602 F. Supp. 2d at 572-74. The parties have submitted approximately 4,500 pages of exhibits pertinent to the pending motions, and they have fully briefed the jurisdictional issues, which are now ripe for disposition.

II. **Standard of Review**

Motions to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), like those for failure to state a claim under Rule 12(b)(6), require the court to accept as true the allegations of the pleadings and all reasonable inferences therefrom. Pinker v. Roche Holdings Ltd., 292 F.3d 361, 368

(3d Cir. 2002).  Unlike Rule 12(b)(6), Rule 12(b)(2) does not limit the scope of the court's review to the face of the pleadings.  See id.; Carteret Sav. Bank, F.A. v. Shushan, 954 F.2d 141, 142 & n.1 (3d Cir. 1992).  Consideration of affidavits submitted by the parties is appropriate and, typically, necessary.  Patterson by Patterson v. FBI, 893 F.2d 595, 603-04 (3d Cir. 1990).

Although plaintiffs bear the ultimate burden of proving personal jurisdiction by a preponderance of the evidence, such a showing is unnecessary at the preliminary stages of litigation.  Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992).  Rather, plaintiffs must merely allege sufficient facts to establish a prima facie case of jurisdiction over the person.  Id.  Once these allegations are contradicted by an opposing affidavit, however, plaintiffs must present similar evidence in support of personal jurisdiction.[21]  Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 330-31 (3d Cir. 2009); Carteret Sav. Bank,

---

[21]The court is aware of case law suggesting that plaintiff may not rely on the pleadings alone but must produce affidavits or other affirmative evidence to overcome a jurisdictional challenge under Rule 12(b)(2).  See, e.g., Rodi v. S. New Eng. Sch. of Law, 255 F. Supp. 2d 346, 348 (D.N.J. 2003).  However, this misstates plaintiff's burden.  If the moving party fails to submit evidence contravening the allegations of the complaint, the court is bound to accept plaintiff's allegations regardless of whether plaintiff  presents further evidence in support thereof.  See Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004) (observing that, unless the court hears evidence on the jurisdictional issues, all allegations must be taken as true for purposes of assessing whether the plaintiff has established a prima facie case of jurisdiction); Carteret Sav. Bank, 954 F.2d at 142 n.1 (stating that the "plaintiff need only plead [a] prima facie case to survive the initial [Rule 12(b)(2)] motion, but must eventually establish jurisdiction by a preponderance of the evidence").  In other words, although the burden of persuasion always lies with the non-moving party, the burden of production rests initially with the party moving for dismissal under Rule 12(b)(2).

954 F.2d at 142 & n.1, 146; <u>Patterson</u>, 893 F.2d at 603-04.  "[A]t no point may a

plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule

12(b)(2) motion to dismiss for lack of in personam jurisdiction. . . .  Once the motion

is made, plaintiff must respond with actual proofs, not mere allegations."

<u>Patterson</u>, 893 F.2d at 604.  When the plaintiff responds with affidavits or other

evidence in support of its position, the court is bound to accept these

representations and defer final determination as to the merits of the allegations

until a pretrial hearing or the time of trial.  <u>Carteret Sav. Bank</u>, 954 F.2d at 142 n.1

(stating that the "plaintiff need only plead [a] prima facie case to survive the initial

[Rule 12(b)(2)] motion, but must eventually establish jurisdiction by a

preponderance of the evidence") (citing <u>Behagen v. Amateur Basketball Ass'n</u>,

744 F.2d 731, 733 (10th Cir. 1984)).

## III.   <u>Discussion</u>

A court must possess one of two forms of personal jurisdiction over each

defendant brought before it.  <u>D'Jamoos ex rel. Estate of Weingeroff v. Pilatus</u>

<u>Aircraft Ltd.</u>, 566 F.3d 94, 102 (3d Cir. 2009).  The first of these forms, known as

specific jurisdiction, enables a court to hear claims that arise from a defendant's

contacts with the forum where the court sits.  <u>Helicopteros Nacionales de Colombia</u>

<u>v. Hall</u>, 466 U.S. 408, 414 n.8 (1984).  In contrast, a court exercising general

jurisdiction may hear any claim against a defendant that possesses systematic and

continuous contacts with the forum regardless of whether the claim resulted from

the defendant's forum-related activities.  <u>Id.</u> at 415 n.9.  When a plaintiff invokes a

federal statute authorizing nationwide service of process,[22] the United States as a whole serves as the relevant forum for purposes of jurisdictional contacts.  In re Auto. Refinishing Paint Antitrust Litig., 358 F.3d 288, 298 (3d Cir. 2004).

### A.    Governing Principles of General Jurisdiction

In the matter *sub judice*, plaintiffs invoke general jurisdiction against each of the Rule 12(b)(2) defendants.[23]  A plaintiff may acquire general jurisdiction over a corporate defendant via two alternate avenues.  First, the plaintiff may show that the defendant possesses systematic and continuous contacts with the forum where plaintiff brings suit.  Second, in cases against foreign corporations, the plaintiff may demonstrate that the out-of-forum corporation either controls or is controlled by an in-forum affiliate to such a degree that the two corporations operate as a single, amalgamated entity.  This fusion of corporate identity—often described as an alter

---

[22]Section 12 of the Clayton Act, 15 U.S.C. § 22, permits nationwide service in antitrust cases, including those arising under the Sherman Act.

[23]Plaintiffs briefly advocate specific jurisdiction over Mars Canada, Cadbury Holdings, and Cadbury plc.  The court will address these arguments at infra notes 34 and 56.  In their original briefs in opposition, they also argued that the court could exercise specific jurisdiction over the defendants under the stream-of-commerce theory and the effects test announced in Calder v. Jones, 465 U.S. 783 (1984).  The former test grants jurisdiction when a defendant places a product into the stream of commerce and the product subsequently causes an in-forum injury.  See Renner v. Lanard Toys Ltd., 33 F.3d 277, 282-83 (3d Cir. 1994).  The Calder effects test confers jurisdiction when a defendant's out-of-forum tortious activity produces foreseeable in-forum results.  See Imo Indus. v. Kiekert AG, 155 F.3d 254, 265-66 (3d Cir. 1998).  Plaintiffs have elected to relinquish these jurisdictional arguments against Mars Canada, (Doc. 621 at 23 n.11), and have not mentioned them in current filings against the remaining Rule 12(b)(2) defendants.  Hence, the court concludes that plaintiffs no longer advocate for jurisdiction under stream-of-commerce and Calder principles.

ego relationship—allows the court to impute the domestic entity's activities to the foreign organization when analyzing jurisdictional contacts.  Lucas v. Gulf & W. Indus., 666 F.2d 800, 805-06 (3d Cir. 1981), abrogated on other grounds by EF Operating Corp. v. Am. Bldgs., 993 F.2d 1046, 1049 & n.1 (3d Cir. 1993).

### 1. Systematic and Continuous Contacts

A court may exercise general jurisdiction over a defendant that possesses systematic and continuous contacts with the forum state.  The defendant must maintain perpetual, abiding ties with the forum.  Metcalfe, 566 F.3d at 334; BP Chems. Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 262 (3d Cir. 2000). Sporadic, ephemeral, or deciduous contacts do not suffice.  Compare Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 445 (1952), with Helicopteros, 466 U.S. at 416-18.  In the corporate context, courts have historically applied general jurisdiction to organizations that hire employees, hold real property, maintain bank accounts, apply for business licenses, advertise, and regularly solicit sales within the relevant forum.  Metcalfe, 566 F.3d at 335; Clark v. Matsushita Elec. Indus. Co., 811 F. Supp. 1061, 1067 (M.D. Pa. 1993).

The cases of Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408 (1984), and Provident National Bank v. California Federal Savings & Loan Association, 819 F.2d 434 (3d Cir. 1987), illustrate that a finding of general jurisdiction turns upon the defendant's qualitative contacts with the forum.  The defendant in Helicopteros was a Colombian corporation that provided air transportation in South America and engaged in monetarily substantial commerce

23

in the United States.  466 U.S. at 409.  It purchased approximately 80% of its helicopter fleet in the United States through transactions that injected over $4 million into the United States economy.  Id. at 411.  It also maintained an American bank account and sent pilots into the United States to retrieve the aircraft that it purchased.  Its personnel entered the country on a number of occasions to negotiate business deals and attend training seminars.  Id. at 410-11.  Despite these recurrent contacts, the Supreme Court concluded that general jurisdiction was unavailable because they did not amount to a systematic business presence in the forum.  Id. at 417-18.  The Third Circuit subsequently explained that the contacts in Helicopteros failed to confer jurisdiction because they "were important *but not central* to the defendant's business, [namely] the provision of helicopter services."  Provident Nat'l Bank, 819 F.2d at 438 (emphasis added).

Instead, general jurisdiction requires a strong nexus a between the defendant's essential business activities and its contacts with the forum.  In Provident National Bank, a financial institution maintained in-forum depositor contacts with less than one-tenth of one percent of its total business portfolio.  Id. at 436.  It also held an account with an in-forum institution through which it cleared customers' checks on a daily basis, and it sold certificates of deposit using an in-forum custodian on approximately sixteen occasions.  Id.  The Third Circuit upheld the exercise of general jurisdiction despite the relatively minor nature of these contacts because they were a core component of the defendant's banking business.  Id. at 438.

In sum, general jurisdiction requires the defendant to possesses qualitative contacts with the forum that constitute "the bread and butter of [the defendant's] daily business," id., such that the its activities "approximate[] business presence" in the forum, William Rosenstein & Sons v. BBI Prod., Inc., 123 F. Supp. 2d 268, 274 (M.D. Pa. 2000) (quoting Bancroft & Masters, Inc. v. August Nat'l Inc., 223 F.3d 1082, 1086 (9th Cir. 2000)).[24] Fleeting activities such as periodic business trips, occasional purchases, and mere communication with in-forum entities hold relatively little sway in the general jurisdiction analysis. Helicopteros, 466 U.S. at 416-17; Kehm Oil Co. v. Texaco, Inc., 537 F.3d 290, 300 (3d Cir. 2008).

## 2.    Alter Ego Jurisdiction

A court may exercise general jurisdiction over a foreign corporation if it has systematic and continuous contacts with the forum or has an alter ego relationship with an affiliated entity that possesses such contacts. Lucas, 666 F.2d at 805-06. When one corporation is a subsidiary of the other, the level of control necessary to substantiate an alter ego relationship must exceed the usual supervision that a

_____

[24]The Third Circuit's recent decision in Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324 (3d Cir. 2009) demonstrates the continued validity of this principle. In Metcalfe, the defendant directly sold eleven powerboats along with ten-year warranties to consumers in the Virgin Islands, a relatively small forum. The court held that defendant directly interacted with in-forum consumers for the purpose of furthering its core business activities and that this conduct, in light of the small forum size, established "ongoing business relationships" sufficient to subject it to general jurisdiction. Id. at 335. Accordingly, general jurisdiction depends not on the mere quantity of contacts that defendant has with the forum but upon whether it engages in forum-related activity with the purpose of "preserv[ing] and enlarg[ing] an active . . . market" in the forum. Id. (quoting Hendrickson v. Reg O Co., 657 F.2d 9, 15 (3d Cir. 1981)).

parent exercises over a subsidiary.  <u>Simeone ex rel. Estate of Albert Francis</u>

<u>Simeone, Jr. v. Bombarier-Rotax GmbH</u>, 360 F. Supp. 2d 665, 675 (E.D. Pa. 2005);

<u>In re Latex Gloves Prods. Liab. Litig.</u>, No. MDL 1148, 2001 WL 964105, at *3

(E.D. Pa. Aug. 22, 2001) (concluding that the mere "monitoring of the subsidiary's

performance, supervision of the subsidiary's finance and capital budget decisions,

and articulation of general polices and procedures" do not establish an alter ego

relationship (quoting <u>United States v. Bestfoods</u>, 524 U.S. 51, 72 (1998))).  More

intrusive control is necessary, and courts evaluate corporate dependence in light of

whether

    (1)    the parent owns all or a significant majority of the subsidiary's stock,

    (2)    commonality of officers or directors exists between the two corporations,

    (3)    the group possesses a unified marketing image, including common branding of products,

    (4)    corporate insignias, trademarks, and logos are uniform across corporate boundaries,

    (5)    group members share employees,

    (6)    the parent has integrated its sales and distribution systems with those of its subsidiaries,

    (7)    the corporations exchange or share managerial or supervisory personnel,

    (8)    the subsidiary performs business functions that would ordinarily be handled by a parent corporation,

    (9)    the parent uses the subsidiary as a marketing division or as an exclusive distributor, and

> (10)    the parent exercises control or provides instruction to the subsidiary's officers and directors.

Chocolate I, 602 F. Supp. 2d at 569-70 (citing Simeone, 360 F. Supp. 2d at 675);

accord Genesis Bio. Pharms. v. Chiron Corp., 27 F. App'x 94, 98 (3d Cir. 2002).  No

one aspect of the relationship between two corporations unilaterally disposes of the

analysis, and the court may consider any evidence bearing on the corporations'

functional interrelationship.  A plaintiff may rely upon an alter ego connection to

acquire jurisdiction over either a foreign parent or a foreign subsidiary based upon

their relationship with an in-forum entity.  Simeone, 360 F. Supp. 2d at 675.[25]

---

[25]Defendant Mars Canada relies upon Turan v. Universal Plan Inv. Ltd., 70 F. Supp. 2d 671, 675 (E.D. La. 1999), and Henry v. Offshore Drilling Pty., Ltd., 331 F. Supp. 340, 343 (E.D. La. 1971), for the proposition that alter ego jurisdiction applies only to foreign parents that exercise control over affiliated entities within the forum.  (Doc. 628 at 10).  The court has identified no controlling Third Circuit precedent addressing this issue; however, our sister courts have consistently exercised alter ego jurisdiction over "either the parent *or the subsidiary* based upon the other's connections to the forum."  Simeone, 360 F. Supp. 2d at 675 (emphasis added); accord Chocolate I, 602 F. Supp. 2d at 570; Oeschle v. Pro-Tech Power, Inc., No. 03-CV-6875, 2006 WL 680908, at *5 (E.D. Pa. Mar. 15, 2006); Directory Dividends, Inc. v. SBC Commc'ns, Inc., No. 01-CV-1974, 2003 WL 21961448, at *3 (E.D. Pa. July 2, 2003); Zwick v. Revco Drug Store, 580 F. Supp. 64, 66 (W.D. Pa. 1984); Aamco Automatic Transmissions, Inc. v. Tayloe, 368 F. Supp. 1283, 1300 (E.D. Pa. 1973). This broader formulation reflects the common-sense principle that the court should not defer to corporate boundaries that the defendant itself has disregarded. When two organizations assume alter ego status, they effectively operate as a single, unified entity notwithstanding the superficial corporate boundaries between them. The consolidated entity is subject to jurisdiction in any forum where it operates regardless of which formal corporation maintains an in-forum presence.  Courts commonly exercise alter ego jurisdiction over a foreign parent based upon its control of an in-forum subsidiary, but reversal of the entities' geographic placement does not restrict the application of alter ego principles.

**B.    The Rule 12(b)(2) Defendants' Jurisdictional Contacts**

In the present case, plaintiffs contend that each of the Rule 12(b)(2) defendants maintains systematic and continuous contacts with the United States. Alternatively, they assert that all defendants except Nestlé Canada are alter egos of their affiliated corporations in the United States. As alter ego relationships define the breadth of relevant jurisdictional contacts, the court will evaluate each defendant's alter ego status before applying general jurisdiction doctrine.

### 1.    Mars Canada

Plaintiffs contend that the court may exercise personal jurisdiction over Mars Canada because it is an alter ego of Mars Global, which is located in the United States. Alternatively, they contend that Mars Canada's in-forum purchases, executive travel, and sales of goods qualify as systematic and continuous contacts with the United States.

### a.    Mars Canada as an Alter Ego of Mars Global

Plaintiffs predicate their alter ego argument upon Mars Global's control of Mars Canada's stock[26] and Mars Canada's status as a business unit of the Mars group. Plaintiffs emphasize that Mars Global profits from dividends and capital repatriations extracted from Mars Canada, establishes group-wide accounting protocols, and must approve executive compensation as well as capital

---

[26]Mars Global owns approximately 38% of Mars Canada's stock and controls the remainder through other Mars subsidiaries. (Doc. 622, Ex. 2 at 70-72; Doc. 622, Exs. 19, 33.)

expenditures in excess of $500,000. Moreover, Mars Canada acquires raw materials from Mars entities in the U.S. in the form of crumb and liquid chocolate.

These facts reflect a parent corporation's control over certain aspects of its subsidiary's business but fall short of that required for a finding of alter ego status. As the controlling shareholder of Mars Canada, Mars Global is entitled to ordain Mars Canada's officers and directors, influence executive compensation, approve budgets, gather information about corporate performance, and receive distributions of subsidiary profits.[27] See Action Mfg. Co. v. Simon Wrecking Co., 375 F. Supp. 2d 411, 425 (E.D. Pa. 2005); Ames v. Whitman's Chocolates, No. Civ.A. 91-3271, 1991 WL 281798, at *6 (E.D. Pa. Dec. 30, 1991); see also Quarles v. Fuqua Indus., Inc., 504 F.2d 1358, 1363 (10th Cir. 1974); In re W. States Wholesale Natural Gas Antitrust Litig., 605 F. Supp. 2d 1118, 1133-34 (D. Nev. 2009). These activities typify standard parent-subsidiary interactions and do not reflect daily, operational control that is the *sine qua non* of an alter ego relationship. See Poe v. Babcock Int'l plc, 662 F. Supp. 4, 6 (M.D. Pa. 1985) (holding that a parent's "exercise [of] some degree of

---

[27]An entity known as the Mars American Treasury and Benefits Center ("ATBC") occasionally participates in the dividend payment and repatriation process. The ATBC is an American entity within the Mars group that provides financial support, tax consultation, and cash management to Mars entities within the United States. (Doc. 622, Ex. 2 at 93.) It sporadically advises Mars Canada, but this interaction is limited because ATBC personnel lack expertise in Canadian law and tax regulations. (Id. at 94.) As the ATBC functions primarily in the United States for the benefit of domestic Mars entities, its participation in dividend and repatriation processes is of relatively little import in the alter ego analysis.

control over the subsidiary" does not constitute an alter ego relationship unless the latter has become indistinguishable from the former).

Issuance of group-wide accounting, finance, and sales protocols through the Finance and Recurring Reports Manuals likewise does not establish an alter ego relationship. Uniformity in finance procedure is a practical necessity for global conglomerates to monitor corporate growth and maximize efficiency, and imposition of mandatory financial reporting does not divest subsidiaries of control over daily operating activities. <u>Bestfoods</u>, 524 U.S. at 72 (stating that supervision of a subsidiary's capital and finance decisions does not establish an alter ego relationship with its parent); <u>Action Mfg. Co.</u>, 375 F. Supp. 2d at 425; <u>Catalina Mktg. Int'l Inc. v. Coolsavings.com, Inc.</u>, No. 00 C 2447, 2003 WL 21542491, at *5 (N.D. Ill.

July 3, 2003); <u>Amarillo Oil Co. v. Mapco, Inc.</u>, 99 F.R.D. 602, 606 (N.D. Tex. 1983).[28]

To the contrary, the Mars Finance Manual encourages subsidiaries to "var[y] . . . the way in which corporate principles are applied in practice," (Doc. 622, Ex. 17 § 1.1.2, at 4), to implement operating plans "at the local level," (<u>id.</u> § 7.1.4.2, at 4), and to establish workplace policies governing their constituent workforces, (<u>id.</u> § 10.1.2, .2.6).

Mars Canada corporate designee Mary Jane Dowling ("Dowling") confirmed that Mars Global and Mars Canada endeavor to

> "Think globally, [but] act locally." In other words, the local units are very autonomous. We are linked by global brands, but the units would actually operate and market [their] products at the local level. . . . [A]gain, "Think global, act local."

* * *

---

[28]<u>Amarillo Oil Co. v. Mapco, Inc.</u> illustrates that centralized accounting and finance policies do not create an alter ego relationship. In <u>Amarillo Oil</u>, plaintiffs filed a diversity suit against an out-of-forum parent but did not join its local subsidiary. Defendants moved to dismiss on the ground that the subsidiary was an indispensable party. 99 F.R.D. at 603. Plaintiffs responded that the subsidiary constituted an alter ego of the parent and that its technical joinder was therefore unnecessary. <u>Id.</u> They also urged the court to disregard its citizenship for diversity purposes and to rely exclusively upon the citizenship of its alleged alter ego parent. <u>Id.</u> They argued, <i>inter alia</i>, that the two corporations had consolidated accounting functions within the parent organization. The court rebuffed plaintiffs' argument, noting that "[c]entralized accounting services for a parent and its subsidiaries is a common feature of the modern corporate landscape" and does not alone reflect the type of pervasive corporate control essential to an alter ego relationship. <u>Id.</u> at 606. The subsidiary owned its own land and fungible assets, elected its own directors (which were identical to those of its parent), and maintained contractual relationships independent of its parent. <u>Id.</u> In the present matter, Mars Canada has a similar relationship with Mars Global. Although the two corporations share certain finance and accounting policies, Mars Canada oversees operations, sells products, and holds real estate without participation from Mars Global.

> On a day-to-day basis, we do not have significant contact with Mars
> [Global].

(Doc. 622, Ex. 2 at 150-51.)  The record corroborates the veracity of Dowling's

statement.  Mars Canada retains its own senior officers, who assume full

responsibility for operations and administration.  (Id. at 12.)  They do not supervise

employees of other Mars entities or manage activities beyond the auspices of their

employing corporation.  (Id. at 11-16.)  Mars Canada produces and distributes

several products that are not widely available to consumers in the United States,[29]

and it develops promotional materials and implements marketing campaigns

without input from other Mars entities.  It also sets the prices at which it sells

products to Canadian distributors and manages its production facilities without

Mars Global oversight.

Most compelling, Mars Canada exercises meaningful control over the manner

in which it pays dividends and repatriates capital.  Mars Global typically solicits

repatriation, but either Mars Global or Mars Canada may initiate a dividend.  The

two corporations actively discuss the terms of either transfer.  Dowling explained

that if Mars Canada resists a particular disbursement, executives from both

companies "negotiate" until they "feel comfortable" with the transaction.  (Id. at

---

[29]These brands include Maltesers®, which are bite-size malt-flavored spheres
covered in chocolate, and Bounty®, a chocolate bar with a coconut center.
(Doc. 628, Ex. 3 ¶ 13); see also Mars Canada - Our Brands, http://www.mars.com
/Canada/en/Our+brands.htm (last visited Aug. 6, 2009).  The company also
manufactures a line of Dove products called Dove Promises®, whose wrappers
contain epigrams similar to those found in fortune cookies.  (Doc. 628, Ex. 3 ¶ 14.)

83-84.)  On occasion, Mars Canada has opposed a dividend or repatriation proposal,

causing Mars Global to withdraw its proposed transfer.  (Id.)  The two corporations

have always conferred about such transfers and have never reached an impasse in

which Mars Global insisted upon a payment over Mars Canada's objection.[30]  (Id.)

The court concludes that Mars Global and Mars Canada maintain distinct

corporate identities.  Mars Global promulgates a group-wide corporate vision, but it

does not dictate the minutiae of subsidiary operating activity.  Plaintiffs have failed

---

[30]During Dowling's deposition, plaintiffs' counsel asked her which
corporation "would trump" the other in the event that the two could not agree.
(Doc. 622, Ex. 2 at 84; see also id. at 93, 151.)  Dowling explained that such a
situation has never arisen but speculated that Mars Global could require Mars
Canada to act if it chose to do so.  (Id. at 84, 96, 151-52.)  Such hypothetical
guesswork receives little weight in the court's jurisdictional analysis because it does
not reflect the pragmatic relationship between the two corporations, which has
never required Mars Global to mandate a payment over Mars Canada's objection.
Dowling stated that the two entities negotiate a financial transfer consistent with
both entities' objectives.
    Plaintiffs also rely upon a $75 million redemption of Mars Canada shares in
June 2006 to establish an alter ego relationship.  (Doc. 622, Ex. 18.)  Plaintiffs
contend that "Mars Canada's directors played no role in determining the price of
the stock redemption" during which Mars Canada transferred funds to a subsidiary
of Mars Global.  (Doc. 621.)  Dowling, however, explained that this transfer—like all
dividends and capital repatriations—was the subject of negotiation by Mars Canada
and Mars Global.  She stated that Mars Canada's treasurer "jointly determined" the
value of the transaction with Mars Global and that Mars Global exercised the "final
say."  (Doc. 622, Ex. 2 at 77; see also id. at 79.)  She further explained that the
transaction was negotiated through the bargaining process typical of capital
repatriations between Mars Canada and Mars Global.  (Id. at 81-82.)  A collaborative
transfer of capital does not demonstrate draconian parental control sufficient to
establish alter ego status.  See Action Mfg., 375 F. Supp. 2d at 425 (refusing to
exercise alter ego jurisdiction despite parent's involvement in setting the timing of
dividends paid by subsidiary); accord Bestfoods, 524 U.S. at 72 (1998).

to proffer prima facie evidence of an alter ego relationship between the two companies.

### b. Mars Canada's Contacts with the United States

Jurisdiction over Mars Canada must therefore arise from its contacts with the United States irrespective of its parent's activity. Plaintiffs seek to acquire general jurisdiction over Mars Canada because it sells chocolate to Mars Snackfood, imports products and raw materials from the United States, and has joined three trademark licensing agreements in which it agreed to be governed by American law. Plaintiffs also rely upon business travel by Mars Canada's executives into the United States.

None of these contacts endows the court with general jurisdiction over Mars Canada. "General jurisdiction is usually found 'where a non-resident defendant makes a substantial number of direct sales in the forum, solicits business regularly and advertises in a way specifically targeted at the forum market.'" See Walters v. Nakata Eng'g Co., No. Civ. A. 08-1458, 2009 WL 18136131, at *6 (W.D. Pa. June 25, 2009) (quoting Strick Corp. v. A.J.F. Warehouse Distribs., Inc., 532 F. Supp. 951, 956 (E.D. Pa. 1982)); see also Metcalfe, 566 F.3d at 335 (predicating general jurisdiction upon fewer than twenty sales directly to consumers within the forum). The transfers between Mars Canada and Mars Snackfood are consummated as arms-length wholesale transactions outside of the United States with the two companies exchanging cash for products. Mars Canada possesses no control over Mars Snackfood's distribution or promotion, nor does it sell products to U.S. retailers and

34

consumers.  The product transfers reflect passive dissociation from the American market rather than jurisdictional engagement with it.  See, e.g., Fisher v. Teva PFC, SRL, No. 04-CV-2780, 2005 WL 2009908, at *3 (D.N.J. Aug. 16, 2005) (rejecting sales to independent distributors in the forum as a basis of general jurisdiction); Rosenstein & Sons, 123 F. Supp. 2d at 274 ("[E]ngaging in commerce with residents of a forum state is not in an of itself the kind of activity that approximates physical presence within the state's borders."  (quoting Bancroft & Masters, 223 F.3d at 1086)); Clark, 811 F. Supp. at 1063-64, 1070 (declining to exercise general jurisdiction over a foreign corporation that transferred products to its subsidiary, which distributed them throughout the United States).

Purchases of crumb and liquid chocolate, though occurring regularly, do not give rise to general jurisdiction.  Helicopteros, 466 U.S. at 418 ("[M]ere purchases, even if occurring at regular intervals, are not enough to warrant . . . assertion of in personam jurisdiction over a nonresident corporation. . . .").  Manufacture of these materials is a trade secret of the Mars group, and Mars Canada must purchase them from other Mars entities to produce Mars-branded products in Canada.  Periodic purchases of raw materials do not establish personal jurisdiction over a non-American entity.  Id. (rejecting general jurisdiction over a purchaser of helicopters that acquired approximately 80% of its fleet in the United States).

The three trademark licensing agreements are also unavailing to plaintiffs. Mars Canada ratified two of the agreements after Mars entities in the United States negotiated and implemented them.  (Doc. 622, Ex. 12 at 1594, 1596; Doc. 622, Ex. 13

recitals, at 1649.)  It joined the agreements to facilitate co-branding in Canada, and it did not license any trademarks or products for use in the United States.[31] Although the agreements subject Mars Canada to American law, only two of them require it to litigate claims in U.S. courts.[32]  (Compare Doc. 622, Ex. 11 ¶ 16, with Doc. 622, Ex. 12 ¶ 13, at 1591; Doc. 622, Ex. 13 ¶ 11.3, at 1628 & attach. C ¶ 12.3, at 1645.)  The court must consider these agreements in light of their purpose, namely to facilitate the co-branding of *Canadian* products for distribution *in Canada*.  The participation of American firms in these agreements is simply an incidental consequence of Canadian distribution activities and does not subject Mars Canada to general jurisdiction in the United States.  See Corrales Martin v. Clemson Univ., No. Civ.A. 07-536, 2007 WL 4531028, at *6 (E.D. Pa. Dec. 20, 2007) (declining to invoke general jurisdiction in a discrimination case over a defendant that licensed

_____

[31]Dowling testified that Mars Canada "owns all its own trademarks in Canada."  (Doc. 622, Ex. 2 at 125; accord Doc. 628, Ex. 2 ¶ 17.)  Thus, the company's participation is likely necessary in any Canadian licensing deal involving Mars-branded products.  The DreamWorks and Unilever contracts exemplify this.  Mars entities in the U.S. prepared both contracts, the geographic scope of which was originally limited to the United States.  Mars Canada ratified the agreements only when the signatories sought to extend the trademark license to Canada.  (Doc. 622, Ex. 12 at 1596; Doc. 622, Ex. 13 recitals, at 1649.)

[32]One agreement contains a choice-of-law provision applying Delaware law, but it does not specify a forum in which the signatories must litigate disputes.  (Doc. 622, Ex. 11 ¶ 16.)  The second agreement grants the courts of New York non-exclusive jurisdiction to hear contract claims, (Doc. 622, Ex. 12 ¶ 13, at 1591), and the third agreement requires that suits be filed in California federal or state court, (Doc. 622, Ex. 13 ¶ 11.3, at 1628 & attach. C ¶ 12.3, at 1645).

its trademarks to in-forum businesses); see also Bradford Co. v. Afco Mfg., 560 F. Supp. 2d 612, 621 (S.D. Ohio 2008).

Finally, plaintiffs argue that the court may exercise personal jurisdiction because Mars Canada executives traveled to the United States approximately eighty-five times per year between 2001 and 2008.[33] Courts generally rely upon business trips for jurisdictional purposes when performed to generate business in the forum. They have predicated general jurisdiction upon travel necessary to effectuate direct sales to consumers, to provide warranty and maintenance services, and to perform in-forum promotional activities. See, e.g., Cresswell v. Walt Disney Prods., 677 F. Supp. 284, 286-87 (M.D. Pa. 1987) (applying general jurisdiction to a defendant that promoted its services, maintained a telephone number, recruited employees, and entered joint ventures in the forum and traveled thereto in furtherance of these activities); see also Passero v. Killington Ltd., No. Civ.A. 92-5304, 1993 WL 406726, at *3 (E.D. Pa. 1993). The travel of Mars Canada's executives does not serve such purposes. It occurs primarily to attend meetings, participate in group-wide conferences, and receive training from the parent organization. (Doc. 619, Ex. 37 at 34-35.) The travel does not reflect Mars Canada's intent to engage the U.S. in a commercially meaningful way and does not "approximate[] physical presence" within American borders. Rosenstein & Sons, 123 F. Supp. 2d at 274;

---

[33]Mars Canada traveled to the U.S. on more than 700 occasions between 2001 and 2008, resulting in an average of approximately eighty-five trips per year. (Doc. 622, Ex. 16.)

accord <u>Helicopteros</u>, 466 U.S. at 417; <u>Rosenberg Bros. v. Curtis Brown Co.</u>, 260 U.S. 516, 518 (1923) (concluding that no jurisdiction existed over a defendant that frequently entered the forum merely to purchase goods); <u>Noonan v. Winston Co.</u>, 135 F.3d 85, 92-93 (1st Cir. 1998) (holding that defendant's persistent solicitation of in-forum business and periodic in-forum trips were insufficient to establish general jurisdiction); <u>Wilson v. Can. Life Assurance Co.</u>, No. 4:08-CV-1258, 2009 WL 532830, at *6 (M.D. Pa. Mar. 3, 2009) (opining that the court lacked general jurisdiction over a defendant that entered the forum to purchase products on seventy separate occasions).

Nor do Mars Canada's contacts establish general jurisdiction when aggregated. The company has a vapid relationship with the United States, entering American territory only to engage in periodic organizational meetings and purchase raw materials. Several degrees of separation sever it from American consumers, and its operational activity occurs entirely in Canada. The court therefore finds that plaintiffs have failed to establish a prima facie case of general jurisdiction over

Mars Canada.  Its motion to dismiss for lack of personal jurisdiction will be

granted.[34]

### 2. Nestlé S.A.

Plaintiffs assert that Nestlé USA acts as an alter ego of Nestlé S.A., giving

rise to general jurisdiction by virtue of Nestlé USA's in-forum operating activity.

---

[34]Plaintiffs assert that the court may exercise specific jurisdiction over Mars Canada based upon the transfer of chocolate products to Mars Snackfood at wholesale prices established by the Finance Manual.  (Doc. 621 at 23-24.)  A court may exercise specific jurisdiction over a claim that is related to the defendant's contacts with the forum.  The plaintiff must demonstrate that the lawsuit is the foreseeable consequence of the defendant's forum-centered action.  O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 323 (3d Cir. 2007).  "The link between the defendant's action and the plaintiff's claim need not rise to the level of proximate causation, but the connection must be 'intimate enough to keep the quid pro quo [between in-forum activity and jurisdictional exposure] proportional and personal jurisdiction7 reasonably foreseeable.'"  Chocolate I, 602 F. Supp. 2d at 558 (alteration in original) (quoting O'Connor, 496 F.3d at 323).  In this case, plaintiffs allege that Mars Canada charged Mars Snackfood prices that allowed Mars Snackfood to "achieve a greater profit margin on the chocolate products at issue in this case, particularly when anti-competitive conduct is present."  (Doc. 621 at 24.)  Plaintiffs' argument stretches the quid pro quo between the transfer of products and specific jurisdiction too thin.  Mars Canada sold no chocolate products to American consumers, and it exercised no control over the prices Mars Snackfood charged in the U.S. market.  Instead, Mars Canada acts as a remote wholesaler whose pricing power ends when its products leave the warehouse.  "A plaintiff cannot hold a manufacturer liable for a price-fixing harm occurring after the product left the manufacturer's hands absent a showing that the manufacturer retained control over product pricing."  Chocolate I, 602 F. Supp. 2d at 560; accord Pinker, 292 F.2d at 368 (reiterating that specific jurisdiction requires that the plaintiff's claim "relate[] to or arise[] out of the defendant's contacts with the forum"); Patent Incentives, Inc. v. Seiko Epson Corp., No. Civ.A. 88-1407, 1988 WL 92460, at *5 (D.N.J. Sept. 6, 1988) (refusing to exercise specific jurisdiction over a patent infringement suit against a defendant that shipped products into the forum because the plaintiff's claim was unrelated to the distribution activity).  Under the circumstances of this case, subjecting Mars Canada to American antitrust law when it exercises no pricing authority in the U.S. would be fundamentally inequitable.

Alternatively, they allege that Nestlé S.A. possesses its own systematic and continuous contacts with the United States.

### a.     Nestlé USA as an Alter Ego of Nestlé S.A.

Plaintiffs contend that Nestlé S.A. controls Nestlé USA through the corporate conduits of Nestec and Société.[35]  It allegedly uses Nestec and Société to (1) centralize management of intellectual property, (2) direct the Nestlé group's activities through SBUs, and (3) establish group-wide pricing systems through the SGDU.  They further argue that Nestlé S.A.'s collection of financial data and creation of a directorship position for operations support their alter ego claim.

### i.     Activities of Nestec and Société

Plaintiffs' alter ego theory fails in part because they seek to effect jurisdiction by aggregating the activities of various Nestlé entities to create a single, direct chain of control between Nestlé S.A. and Nestlé USA.  Plaintiffs have not accompanied these allegations of monolithic control with record support that Nestlé S.A. domineers the daily affairs of Nestec and Société, which are essential links in their alter ego theory.

---

[35]Plaintiffs argue that Nestlé S.A.'s Articles of Association authorize it to assume omnipotent control over subsidiary corporations.  The Articles allow Nestlé S.A. to "participate in" the activities of the Nestlé group, (Doc. 618, Ex. 1 art. 2(1)), and confer upon its board the non-delegable responsibility for "the ultimate direction of the business of Nestlé," (id. art. 18(a)).  According to Frick, Swiss law prohibits the board from transferring this duty to a third party.  (Doc. 618, Ex. 2 at 144.)  Nestlé S.A.'s Articles of Association provide a point of reference for the jurisdictional analysis but do not dictate its outcome, which depends upon Nestlé S.A.'s daily business relationships with its affiliated corporations.

Plaintiffs contend that Nestlé S.A. controls Nestlé USA by its centralized management of intellectual property. In actuality, Nestlé S.A. is only the beneficial owner of the Nestlé group's intellectual property. Nestec and Société—not Nestlé S.A.—manage the group's IP assets. Nestlé S.A. employs the persons in charge of trademark and patent management, but Société employs approximately fifty individuals who act as "[t]rademark agents, trademark advisors, and support staff for . . . the position of trademarks, the renewal of trademarks, and for fighting against other companies." (Doc. 618, Ex. 2 at 62.) Nestec also employs intellectual property staff who perform patent and trademark work on behalf of the SBUs. (Id. at 172-73.) All IP staff report either to the group head of trademarks or to the group head of patents. (Doc. 618, Ex. 23 at 32.) These executives are employees of Nestec. (Doc. 618, Ex. 2 at 175.) The head of trademarks reports to Nestlé S.A. general counsel and corporate designee Hans Peter Frick ("Frick"), while the head of patents reports to Werner Bauer ("Bauer"), its chief technology officer. (Id. at 8, 12, 20, 49, 222.) Frick explained that his involvement with Nestec is limited to signing documents on the company's behalf and that Nestec managers oversee its operations on a daily basis. (Id. at 64-65.) Moreover, nothing in the record suggests that Bauer has any greater responsibilities for Nestec patents than Frick has for

Nestec marks. The court will not presume that Nestlé S.A. controls Nestlé USA

through the IP-licensing actions of Nestec and Société without such evidence.[36]

Plaintiffs' arguments regarding Nestlé S.A.'s control of the SBUs suffers from

the same infirmities. They assert that "Nestlé S.A. initiated SBU's organized

around products groups managed centrally out of Vevey, Switzerland *by some*

*combination of Nestlé S.A. and Nestec . . . employees* reporting to the Nestlé S.A.'s

head of SBU's." (Doc. 617 at 5-6 (emphasis added)). Plaintiffs have not described

what "combination" of Nestec and Nestlé S.A. employees managed the SBUs, and

their failure to do so precludes them from invoking the SBUs as a conduit of

corporate control between Nestlé S.A. and Nestlé USA. Moreover, the record

reflects that Nestec operates the SBUs independently of Nestlé S.A. and its

operating entities. The head of the SBUs appears on the Nestlé S.A. payroll, but

the individuals who staff business units are Nestec personnel, (Doc. 618, Ex. 2 at

---

[36]Assuming *arguendo* that Nestlé S.A. directly controlled Nestec and Société, their trademark licensing activities would be insufficient to establish alter ego jurisdiction. Nestlé USA's licensing agreements are incidental to its status as the exclusive distributor of Nestlé-branded merchandise in the United States, and the mere presence of contractual ties between two related corporations does not meld into them a single entity. Financial benefits ordinarily flow from subsidiary corporations to their parents. That some of those benefits pass from Nestlé USA to Nestlé S.A. in the form of royalties rather than dividends sheds little light on the control that Nestlé S.A. exercises over Nestlé USA's operational affairs. See, e.g., In re Lupron® Mktg. & Sales Practices Litig., 245 F. Supp. 2d 280, 290-92 (D. Mass. 2003) (rejecting alter ego as a means of acquiring jurisdiction over a foreign parent who received royalty payments from an in-forum subsidiary); Seltzer Sister Bottling Co. v. Source Perrier S.A., No. C-90-1468, 1991 WL 279273, at *4 (N.D. Cal. May 1, 1991) (declining to exercise alter ego jurisdiction over a parent whose subsidiary held trademark licenses from an affiliated entity but had no direct contractual relationship with the parent).

149-50, 223, 233; Doc. 627, Ex. A ¶ 13), and Frick flatly rejected the notion that

Nestlé S.A. uses the SBUs to exert autocratic control over other members of the

corporate group:

> Q. And so [the head of SBUs and the SGDU] has supervisory
> responsibilities delegated from the board of directors to the
> CEO to him to supervise[ and] manage marketing *through the
> ranks of the Nestlé group*?
>
> * * *
>
> A. No.
> Q. No?
> A. No.
> Q. How does it work?
> A. He is the head of the [SBUs], and he has one or two specific
> [SGDUs], working for him to develop a program that might be
> sent to the operating companies, *[which] might then implement
> these programs or not.*

(Doc. 618, Ex. 2 at 233-34 (emphases added)).

The manner in which the SBUs oversee strategic marks corroborates their

independence.  When a potential infringement of a strategic mark arises, the issue

is referred to the Nestec SBU assigned to protect the mark.  (Id. at 78-84.)

Infringement reports may come from an operating entity or a RIPA but usually

originate with third parties retained to perform market surveillance.  (Id. at 83-84.)

The SBU then investigates the matter and "call[s] the shots" regarding whether to

commence an infringement action.  (Id. at 78.)  Nestlé S.A. does not dictate the

outcome of this decision-making process.  (Id.)

The lack of correlation between the Nestec SBUs and the operating entities

further illustrates their discrete corporate identities.  Operating entities create

43

SBUs separate from those within Nestec, and these units do not always align with Nestec's SBU structure. Nestlé USA has established SBUs—including one for beverages—that have no direct Nestec counterpart. (Doc. 618, Ex. 15 at 148.) Hence, the Nestec SBUs are not uniform pillars that run from the cornice to the base of the Nestlé group. Operating entities possess identities distinct from both Nestlé S.A. and from the Nestec SBUs, and plaintiffs may not rely upon the strategic business unit model to establish an alter ego relationship between Nestlé S.A. and Nestlé USA.

The SGDU lends no greater aid to plaintiffs' jurisdictional expedition. Its functions include market research and product promotion, (Doc. 627, Ex. A ¶ 14), but the record is devoid of any evidence suggesting that Nestlé S.A. controls the manner in which it discharges these functions. The SGDU formulates "guidelines and best practices," which it distributes to Nestlé operating entities. (Doc. 618, Ex. 2 at 239.) By definition, these instructional resources are not corporate mandates. Nestlé USA maintains an internal SGDU that focuses exclusively on the American market. (Doc. 618, Ex. 15, at 146-47.) There is simply no evidence that Nestlé S.A. controls the Nestec SGDU or that the Nestec SGDU dictates the activities of similar units within the operating entities. The court concludes that the Nestec SGDU is not a viaduct through which Nestlé S.A. imposes its will upon its subsidiaries.[37]

---

[37]Plaintiffs claim that a September 2006 investor seminar led by Lars Olofsson ("Olofsson"), then head of SBUs and the SGDU, demonstrates that "Nestlé

S.A. purposefully directs its management of operations across corporate lines . . . including as to management of 'pricing' the 'Nestlé Way.'" (Doc. 617 at 7.) Olofsson's written materials span forty-three pages, most of which describe product-placement and market-growth efforts. The presentation devotes a scant two pages to pricing strategy. (Doc. 618, Ex. 8 at 40.) The first of these pages contains the following phrases, which form an acronym for the word *price*: "Perceived consumer value," "Review the '5Cs,'" "Integrate marketing mix," "Cross-functional," and "Evaluate constantly." (Id.) The documents do not illustrate how these factors affect pricing. The second page is no more self-explanatory than the first. The phrases "From 'Cost +'" and "To 'Consumer Value Based Pricing'" appear in the heading and are joined by a right-facing arrow pointing from the first phrase to the second. (Id. at 41.) Several photos of Nestlé products are placed beneath this heading and accompanied by a table of plus (+) and equal (=) signs that apparently reflect profit margins on the pictured items. (Id.) Below the table, products are then coupled with consumer shibboleth. For instance, the phrases "Foamier Convenience" and "Just Like Human Food" accompany Nescafé® Cappuccino and Beneful® dog food products, respectively. (Id.) Obviously marketing monikers and whimsical slogans do not constitute the monolithic pricing structure that plaintiffs postulate.

These slides reflect a change in the Nestlé group's pricing strategy announced in late 2005 or early 2006 by Edward Marra ("Marra"), Olofsson's predecessor. During a June 2005 investor presentation, Marra explained that the newly created SGDU model sought to change pricing formulae from arithmetical mark-up percentages to strategies that aligned prices with consumers' perception of product value. (Doc. 618, Ex. 11 at 9.) Hence, products designed to impart an image of sophistication would receive a greater mark-up than those directed toward more functional ends. (Id.) The record does not contain a copy of the SGDU pricing policy or explain how it ultimately determined prices, and Marra's comments provide the sole elucidation of the revised pricing protocol. It is unclear whether Nestlé USA fully implemented the policy shift that Marra espoused, and Frick explained that while the SGDU developed this policy, neither it nor Nestlé S.A. participate in subsidiaries' daily pricing decisions. (Doc. 618, Ex. 2 at 239.) The SGDU provided "some guidelines and best practices" about implementation new pricing strategies, but ultimate supervision of product lines remained the task of the operating entities. (Doc. 618, Ex. 15 at 21.)

Both Marra's presentation and Frick's statements confirm that the Nestec SGDU did not usurp the role of pricing from operating subsidiaries. Marra's seminar primarily focused upon the SGDU's "approach on sales and marketing, [also known as] . . . strategic demand generation." (Doc. 618, Ex. 11 at 2.) Most of the presentation recapitulated recent product rollouts and focused upon future innovation. A meager three paragraphs of the thirteen-page program transcript

### ii. Activities of Nestlé S.A. and Other Non-Party Nestlé Entities

Nestlé S.A.'s collection of financial data through management letters and the

GLOBE system, royalty transfers from Nestlé USA, and institution of a directorship

position for operations do not create an alter ego relationship with Nestlé USA. A

parent corporation is entitled to establish group-wide financial protocols, monitor

the performance of its subsidiaries, and reap financial benefits from their profits.

Bestfoods, 524 U.S. at 71 (stating that a parent is entitled to monitor the

performance of its subsidiaries); Wholesale Natural Gas, 605 F. Supp. 2d at 1133

(same). Nestlé S.A.'s receipt of royalty payments and review of Nestlé USA's

monthly management letters and other reports reflect customary interactions of

any parent-subsidiary relationship.

Use of the GLOBE system to achieve these ends is of little jurisdictional

moment. Implementation of IT systems such as GLOBE is a ubiquitous practice in

---

address pricing. Marra briefly explained that the SGDU was "giv[ing] our generating demand people around the world the processes, the tools and the training so that they can more effectively plan *their pricing strategies*" within individual operating companies. (Id. at 7 (emphasis added)). The quoted passage suggests that the SGDU was designed to advise operating entities but not control them. Such activity is akin to the consultation and support that parent corporations routinely provide subsidiaries and is insufficient to convert Nestlé USA into a drone of Nestlé S.A. See Bestfoods, 524 U.S. at 72; Quarles, 504 F.2d at 1363; In re Lupron®, 245 F. Supp. 2d at 290-92.

The court notes that plaintiffs have forsaken any argument of specific jurisdiction over Nestlé S.A. based upon the implementation of pricing guidelines. (See Doc. 617 at 7 (discussing Nestlé S.A.'s pricing policy in the context of alter ego jurisdiction)). The court expresses no opinion regarding whether corporate pricing guidelines, in any context, may satisfy a minimum contacts analysis for purposes of a § 1 claim.

the modern business landscape, where investors and managers require access to instantaneous data in order to analyze the vacillation of revenue and expense. Utilization of such systems does not establish alter ego jurisdiction, particularly when a parent has implemented them to further activities—such as data collection and subsidiary oversight—that are inconsequential to the court's Rule 12(b)(2) analysis. The doctrine of general jurisdiction does not require a corporation to eschew technological advances to avoid being haled into court, and Nestlé S.A.'s reliance on the GLOBE system does not represent jurisdictionally meaningful contact with the United States.

Nestlé S.A.'s hiring of José Lopez ("Lopez") as a vice president for operations likewise provides no basis for an alter ego relationship with Nestlé USA. Lopez's position purportedly "integrate[s sourcing, manufacturing, and supply chain] . . . functions into one Operations Organization at Executive Board level." (Doc. 618, Ex. 20 at 3.) Lopez spearheaded an initiative known as Operation EXCELLENCE, which consulted with operating companies about methods for reducing manufacturing costs. (Doc. 618, Ex. 2 at 190-91.) Personnel within Nestec managed a similar program known as FitNes. (Id. at 192.) The FitNes program paired operating entities with teams of experts, who visited manufacturing facilities and recommended cost-saving measures that operating entities then implemented. (Doc. 619, Ex. 37 at 109-10; see also Doc. 618, Ex. 15 at 152.) Plaintiffs have not described Lopez's daily activities or interactions with Nestlé operating companies. His leadership of Operation EXCELLENCE reflects only that Nestlé S.A. or Nestec

endeavored to consult with operating entities about methods for eradicating

excess costs.  Without additional evidence of operational influence, the appointment

of Lopez and the implementation of efficiency programs do not constitute

Nestlé S.A.'s exercise of pervasive control over essential functions.  <u>See</u> <u>Everitt v.

Dover Downs Entm't</u>, No. Civ.A. 98-6116, 1999 WL 374163, at *5-6 (E.D. Pa.

June 9, 1999) (holding that plaintiffs had not established an alter ego relationship

despite subsidiary's cession of certain management functions to parent and

appointment of officers who had relatively little involvement in managing the

company).

### iii. <u>Independence of Nestlé USA</u>

Contrary to plaintiffs' alter ego allegations, Nestlé USA exercises a significant

degree of autonomy over its daily affairs.  None of the corporation's directors hold

concurrent positions on Nestlé S.A.'s board, and Nestlé USA's CEO and executive

officers manage the day-to-day operations of the corporation.  (Doc. 618, Ex. 15 at

10-15.)  Nestlé USA maintains its own production facilities, purchases raw materials

through contracts to which Nestlé S.A. is not a party, formulates its own budget,

and establishes its own administrative policies.  (<u>Id.</u> at 67, 100-01, 181, 215-18.)

Such factors demonstrate that Nestlé USA does not languish in its parent's shadow.

<u>See</u> <u>Everitt</u>, 1999 WL 374163, at *6; <u>Clark</u>, 811 F. Supp. at 1069.  For all of these

reasons, plaintiffs have failed to establish a prima facie case of alter ego jurisdiction over Nestlé S.A.[38]

### b.   Nestlé S.A.'s Contacts with the United States

Plaintiffs also contend that Nestlé S.A. possesses systematic and continuous contacts with the United States independent of Nestlé USA.  They rely upon (1) the licensing agreement between Société and Hershey, (2) the licensing royalties that Nestlé S.A. receives from its American subsidiaries, (3) roadshow events held to entice American investors, (4) travel by Nestlé S.A. executives to the United States, and (5) Nestlé S.A.'s acquisition of numerous American corporations.  None of these contacts, either individually or collectively, "approximates physical presence" in the United States.  Rosenstein & Sons, 123 F. Supp. 2d at 274.

Neither the licensing of intellectual property (whether to Nestlé operating entities or to Hershey Global) nor receipt of royalties requires Nestlé S.A. to

---

[38]Plaintiffs rely upon In re Genetically Modified Rice Litigation, 576 F. Supp. 2d 1063 (E.D. Mo. 2008), which involved a foreign parent corporation that discharged certain management functions, such as establishing general policy, providing advice to its subsidiaries, and integrating financial structures across corporate boundaries.  Id. at 1068.  Unlike Nestlé S.A., it exercised significantly greater daily authority over its subsidiary.  The parent and subsidiary had executed an agreement under which the subsidiary agreed to "subordinate[] the management of its company" to the parent, which was "entitled to give instruction to [the subsidiary's] Board of Directors regarding the management of the company."  Id. at 1075.  In sharp contrast, Nestlé USA manages its own facilities and develops its own corporate strategy.  It has implemented independent SBUs and SGDU to cater to American consumers.  Nestlé S.A. collects financial data and receives profits from Nestlé USA, but the American company controls its own functional operations on a daily basis.  Accordingly, Genetically Modified Rice provides no ready analogy for the relationship that exists between Nestlé USA and Nestlé S.A.

establish an ongoing business presence in the United States. Société and Nestec oversee trademark licensing activities and work with the RIPAs and operating entities to remedy trademark infringement. The RIPAs are employees of Nestlé operating entities, and plaintiffs have not established that Nestlé S.A. dictates terms of their employment or conditions of the licensing arrangements that they enforce.[39] Further, Société manages the licensing agreement with Hershey Global. Société personnel have the right to inspect Hershey Global's facilities and monitor product quality, and nothing in the record establishes that Nestlé S.A. employees participate in these activities. Nestlé S.A.'s receipt of royalty payments from operating subsidiaries and from Hershey Global constitutes its sole point of licensing contact with the United States. This passive flow of funds from in-forum entities to Nestlé S.A. does not form the cynosure of Nestlé S.A.'s business and is clearly insufficient to confer general jurisdiction. Provident Nat'l Bank, 819 F.2d at 438 (holding that a defendant must perform activities "central to the defendant's business" within the forum before a court may exercise general jurisdiction); Bancroft & Masters, 223 F.3d at 1086 (stating that license agreements with in-forum residents are alone insufficient to establish general jurisdiction); Corrales Martin, 2007 WL 4531028, at *6 (same).

---

[39]The record contains little information regarding the daily tasks that the RIPAs perform. RIPAs advise on trademark issues, (Doc. 618, Ex. 2 at 48), and "manage" certain local brands, (Doc. 618, Ex. 23 at 33), but it is unclear whether they register new trademarks, prosecute enforcement litigation, monitor the market for infringing products, or perform other functions integral to the protection of the Nestlé group's marks.

Conducting investor road shows is also insufficient to corral Nestlé S.A. within the court's jurisdiction. According to plaintiffs, Nestlé S.A. organized twenty-eight road show presentations and thirteen broker events between 2005 and 2009. (Doc. 619, Ex. 35.) Some of these events occurred during single trips to the United States. For example, four road-show events took place on one trip to New York City and Boston on February 27-28, 2008.[40] (Id.) A March 2007 trip accounts for another three road show presentations.[41] (Id.) Based upon the temporal proximity of event dates, it appears that the seminars identified by plaintiffs required approximately thirty separate trips to the United States over a period of five years, an average of six trips per year. These periodic contacts are not the continuous business presence necessary to establish general jurisdiction over a defendant. Landoil Res. Corp. v. Alexander & Alexander Servs., Inc., 918 F.2d 1039, 1044 (2d Cir. 1990) (declining to exercise general jurisdiction on the basis of approximately twenty-five trips into the forum over eighteen months for the purpose of soliciting capital); Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 57-58 (2d Cir. 1985) (same with regard to fifty-four visits over a ten-year period).

-----

[40]Two of these events occured in New York with additional events taking place in Boston and the Napa Valley. Nestlé S.A. travel records confirm that CEO Paul Bulcke entered the United States through the Boston Airport on February 26, 2008 for a road show event and departed from Los Angeles on March 2, 2008 after visiting Nestlé USA's facility located in Glendale, California. (Doc. 618, Ex. 21 at rows 193-94.)

[41]Former CEO Peter Brabeck conducted the three road show presentations in March 2007. (Doc. 618, Ex. 21 at rows 136-38; Doc. 619, Ex. 41.)

Plaintiffs also invoke several high-value merger transactions[42] in which the Nestlé group acquired a controlling interest in brands such as Dreyer's®, Gerber®, and Purina®. Plaintiffs' reliance on these transactions is misplaced for two reasons. First, it is unclear whether Nestlé S.A. was a party to these transactions. The Dreyer's® acquisition was executed by Nestlé Holdings, Inc., an entity that owns Nestlé USA. (Doc. 618, Ex. 15 at 209.) To impute the activity of Nestlé Holdings to Nestlé S.A., plaintiffs would have to establish that an alter ego relationship exists between these two corporations. They have not done so. The remaining mergers are no more helpful to plaintiffs because they have not identified the Nestlé entities that engaged in the transactions or described their relationships to Nestlé S.A. Absent such evidence, plaintiffs' averment that "Nestlé S.A. directs and completes

---

[42]For instance, the Gerber® acquisition was a $5.5 billion deal, (Doc. 618, Ex. 29 at 25), and the Dreyer's® transaction was valued in excess of $2 billion, (Doc. 618, Ex. 31 at 33.)

strategic U.S. acquisitions and divestments" is little more than supposition of marginal jurisdictional relevance.[43] (Doc. 617 at 21.)

Second, courts have been reluctant to use acquisition activity within a forum as a basis for exercise of general jurisdiction. Corporate acquisitions occur during a distinct period of time, and the interaction between the parties ceases at the transaction's closing. A transaction is similar to a single, sporadic forum contact rather than a continuous business presence. Courts have explained that "incorporating a subsidiary in the United States does not give rise to jurisdiction unless the litigation is related to the act of incorporation . . . ." Telcordia Techs.,

---

[43]Plaintiffs' evidence of these transactions consists of several PowerPoint presentations prepared by the Nestlé group that tout their financial benefits but refer to the acquiring entity merely as "Nestlé." These presentations are promotional in nature. They do not identify the structure of the acquisitions or describe the manner in which the transactions were negotiated. This deficiency is fatal to plaintiffs' argument. In essence, plaintiffs ask the court to presume that Nestlé S.A. took part in these transactions without clear, corroborative evidence. Nestlé S.A. may have directly participated in these acquisitions, but it is equally likely that Nestlé S.A. incorporated an acquisition subsidiary to negotiate and implement their terms. If it did so, plaintiffs would be required to establish an alter ego relationship between Nestlé S.A. and the subsidiary before imputing the acquisition to the parent entity. Lucas, 666 F.2d at 805-06; Action Mfg. Co., 375 F. Supp. 2d at 420; supra Part III.A.2. The characterization of the acquiring entity as "Nestlé" is therefore unhelpful to the jurisdictional analysis. The court previously cautioned against such assumptions because they "disadvantage[] plaintiffs when responding to the Rule 12(b)(2) motions, which require that plaintiffs establish personal jurisdiction as to *each particular* corporate defendant." Chocolate I, 602 F. Supp. 2d at 559 n.17. In the present proceeding, plaintiffs could have submitted relevant portions of the merger agreements or deposed appropriate corporate officers about the manner in which the transactions occurred, but they have not done so. Without such evidence, plaintiffs cannot establish that Nestlé S.A. directly participated in these transactions. Based upon the record *sub judice*, the merger activity receives relatively little weight in the court's jurisdictional analysis.

<u>Inc. v. Alcatel S.A.</u>, No. Civ.A. 04-874, 2005 WL 1268061, at *7 (D. Del. May 27, 2005);

<u>see also</u> <u>Monsanto Co. v. Syngenta Seeds, Inc.</u>, 443 F. Supp. 2d 636, 646 (D. Del.

2006); <u>Galen Inv. Advisors, Inc. v. Alcatel</u>, No. C 02-2274, 2002 WL 31319900, at *4, 7

(N.D. Cal. Oct. 10, 2002).  A "pattern of corporate dealing" must accompany merger

activity to support general jurisdiction.  <u>Monsanto Co.</u>, 443 F. Supp. 2d at 646.  In

the present case, plaintiffs have identified eleven acquisitions[44] and fourteen

divestments in which the Nestlé group has participated between 1984 and 2009.

(Doc. 618, Ex. 26 at 6; Doc. 618, Exs. 29-30.)[45]  Assuming that Nestlé S.A. participated

in each of these transactions, it would have performed an average of one deal per

year over this period.  Such periodic transactions do not reflect a continuous

business presence sufficient to confer general jurisdiction.

Lastly, plaintiffs rely upon approximately three hundred trips by Nestlé S.A.

personnel to the United States between 2005 and 2008, an average of seventy-five

trips per year.  (Doc. 618, Ex. 21.)  These trips are entitled to weight in the court's

analysis, but the court must evaluate them in light of the purposes for which they

---

[44]This figure includes nine acquisitions between 1984 and 2003, (Doc. 618, Ex. 26 at 6), and the Novartis and Gerber® transactions identified in plaintiffs' brief, (Doc. 617 at 22).  The court has excluded the 1973 acquisition of Stouffer's®, which occurred more than a decade before all other transactional activity, and the 2002 deal involving Dreyer's®, which was handled by Nestlé Holdings.

[45]Five of these transactions potentially occurred within the putative class period, which runs from December 9, 2002 to at least December 20, 2007.  (Doc. 418 ¶ 37; Doc. 420 ¶ 67; Doc. 422 ¶ 27.)  During this period, the Nestlé group divested two entities (Ortega® and Flipz & Wonderball) in 2002 and one entity (Cross & Blackwell®) in 2003.  (Doc. 618, Ex. 26 at 6.)  It also acquired Gerber® and Novartis in 2007.

were undertaken.  Many were incidental to activities—such as road shows, acquisitions, and investor seminars—that the court has already held insufficient to establish general jurisdiction.  Nestlé S.A. employees also traveled to the United States to perform market visits, attend subsidiary board meetings, and give presentations at university and trade conferences.  (Id.)  Most of the trips lasted for less than one week, and many of them span only two or three days.  Such activity is more reflective of a parent overseeing its subsidiaries than a corporation endeavoring to carry on systematic business activity in the United States.  In sum, Nestlé S.A.'s travel to the United States does not form part of the "bread and butter of its daily business" and is insufficient to confer general jurisdiction over the company.  Provident Nat'l Bank, 819 F.2d at 438; accord Helicopteros, 466 U.S. at 417; Rosenberg Bros., 260 U.S. at 518.

The aggregate effect of these actions does not place Nestlé S.A. within the court's jurisdiction.  Nestlé S.A. performs a variety of functions typical of a foreign parent corporation sitting atop a global corporate network, and its actions are typical of any parent corporation engaged in building brand identity across national boundaries.  Were the court to exercise general jurisdiction over Nestlé S.A., it would effectively pave an avenue by which U.S. courts could exercise jurisdiction in any lawsuit against a foreign corporation with a domestic subsidiary *regardless of where the suit originated*.  Such a holding would apply general jurisdiction to a host of corporations that maintain contacts with the United States but that do not carry out core business functions within its boundaries.  This result would abjure the

mandates of <u>Helicopteros</u> and <u>Provident National Bank</u>.  <u>See</u> <u>supra</u> Part III.A.1.

Accordingly, the court concludes that Nestlé S.A. does not possess systematic and

continuous contacts analogous to a business presence in the United States.  Its

motion to dismiss for lack of jurisdiction will be granted.[46]

### 3.    **Nestlé Canada**

Plaintiffs do not advocate an alter ego relationship between Nestlé USA and

Nestlé Canada but contend that the court possesses general jurisdiction over Nestlé

Canada due to its systematic and continuous contacts with the United States.

Plaintiffs rely upon Nestlé Canada's exportation of products to the United States,

purchase of raw materials from U.S. entities, and co-packing arrangements with

U.S. suppliers.  Both the Supreme Court and the Third Circuit have rejected similar

---

[46]Plaintiff analogize Nestlé S.A. to the defendant in <u>Shepherd Investments</u> <u>Int'l v. Verizon Communications, Inc.</u>, 373 F. Supp. 2d 853 (E.D. Wis. 2005).  In <u>Shepherd Investments</u>, the court invoked general jurisdiction over a foreign holding company that engaged in promotional activities and investor relations in the forum.  Defendant also participated in activities that, unlike Nestlé S.A., approximated a business presence in the forum.  Defendant sold its stock directly to forum residents through an interactive website.  <u>Id.</u> at 864.  It augmented these direct sales by establishing business relationships with approximately 140 domestic banks, through which it paid regular dividends.  <u>Id.</u>  It also initiated and intervened in lawsuits, urged residents to contact their legislative representatives to advocate certain policies, and maintained a lobbying presence in the forum state's capital. <u>Id.</u> at 865-66.  Nestlé S.A. has not engaged in such activity; therefore, <u>Shepherd Investments</u> is factually distinguishable.

arguments in support of general jurisdiction.[47]  Helicopteros, 466 U.S. at 410-11

(rejecting in-forum purchases as a basis for general jurisdiction); Rosenberg Bros.,

260 U.S. at 518 (same with respect to contracts with in-forum vendors); BP Chems.

Ltd., 229 F.3d at 262 (same); see also 3Lab, Inc. v. Kim, No. Civ. 07-1056, 2007 WL

2177513, at *6 (D.N.J. July 26, 2007) ("The purchase of business supplies . . . does not

provide the continuous and systematic contacts necessary to support general

jurisdiction . . . ."); Clark, 811 F. Supp. at 1063-64, 1070.

Plaintiffs contend that the business travel of Nestlé Canada executives and

its retention of attorneys to defend two lawsuits in the United States is sufficient to

establish general jurisdiction.  The court has declined to accord jurisdictional

significance to such travel when unaccompanied by activities that engaged markets

within the forum.  See supra Part III.B.3.b.  Nestlé Canada's executives travel to the

U.S. primarily to attend group-wide conferences and to maintain ties with Nestlé

---

[47]Plaintiffs also seek to assign jurisdiction over Nestlé Canada based upon
contacts that David Mullins, its head of purchasing, maintains with Nestlé Business
Services.  Their reliance upon Mullins's activity is simply an iteration of the
argument that importation of raw materials into Canada confers jurisdiction.  As
previously noted, this activity does not give rise to general jurisdiction.
Helicopteros, 466 U.S. at 417; Wilson, 2009 WL 532830, at *8 ("[M]ere purchases . . .
cannot establish sufficient systematic and continuous contacts for general
jurisdiction.").

USA associated with the two entities' mutual exchange of products.[48]  Further,

Nestlé Canada exercised no control over the filing of the lawsuits against it, and its

defense of legal actions to prevent entry of an adverse judgment does not constitute

an avenue of meaningful interaction with the United States.  Its retention of counsel

to respond to these lawsuits likewise fails to subject it to jurisdiction before this

court.  See Chocolate I, 602 F. Supp. 2d at 567 n.29 ("[I]t is illogical to predicate

general jurisdiction upon . . . employment of attorneys [when the activities

necessitating their retention] . . . fail *ex proprio vigore* to establish such

jurisdiction.").[49]

Finally, Nestlé Canada's contacts, when aggregated, do not establish a

sustained, continuous business presence in the forum.  Nestlé Canada does not

promote products to American consumers, maintains no facilities in the U.S., and

---

[48]Nestlé Canada personnel travel to the United States for two distinct
purposes.  First, staff who manage Nestlé Canada's confectionary productions
periodically enter the U.S. to attend strategic conferences on "the future of
chocolate."  (Doc. 619, Ex. 37 at 35.)  Second, personnel within Nestlé Canada's
nutrition division "report . . . into the US nutrition business" and travel to the
United States to further this relationship.  (Id. at 34.)  The record does not describe
the reasons for this travel and reflects only that the division imports power bars and
other nutritional products from the United States for sale to consumers in Canada.
(Id. at 190-91.)  Presumably, travel by its personnel occurs to effectuate these
purposes.  The court finds that this travel is akin to the inventory-supply activity
found inadequate to establish jurisdiction in Helicopteros and Rosenberg Brothers.

[49]Plaintiffs contend that Nestlé Canada has an agent for service of process in
the United States.  The factual record reveals that Nestlé Globe, Inc., a wholly
owned subsidiary of Nestlé Canada, maintains this agent.  (Doc. 619, Ex. 37 at 175.)
Plaintiffs have not established that these two entities are alter egos of one another,
and the court will not consider Nestlé Globe's contacts with the U.S. in the
jurisdictional analysis against Nestlé Canada.

employs no personnel here. The court concludes that it does not possess systematic contacts with the United States and is not subject to general jurisdiction. See BP Chems. Ltd., 229 F.3d at 262. Its motion to dismiss will be granted.[50]

### 4. Cadbury plc and Cadbury Holdings

Plaintiffs contend that Cadbury USA is an alter ego of Cadbury plc and Cadbury Holdings because it exchanges employees with its parent corporations, who allegedly influence its daily affairs. Both Cadbury plc and Cadbury Holdings are successors of Cadbury Schweppes, which was the ultimate parent company of the Cadbury group during the putative class period. The court will jointly consider the actions of Cadbury plc and Cadbury Holdings for purposes of the jurisdictional analysis.[51]

---

[50]In light of the dismissal of Mars Canada, Nestlé S.A., and Nestlé Canada, the motions to dismiss (Docs. 469, 476) plaintiffs' amended complaints under Rule 12(b)(6) will be denied as moot with respect to these defendants.

[51]Joint consideration of Cadbury plc and Cadbury Holdings is also appropriate because they coordinate all of their corporate activities and function as a unified parent entity. Cadbury plc discharges the Cadbury group's financial reporting requirements while Cadbury Holdings manages its operating subsidiaries. These activities complement one another, and Chambers testified that the two entities operate as a single indistinguishable entity on a daily basis. Consequently, the court may consider them as one organization notwithstanding the corporate lines that separate them.

Plaintiffs have produced prima facie evidence of alter ego control between Cadbury USA and its parent corporations.[52] Cadbury Holdings vertically manages the Cadbury group through business units aligned with product groups rather than corporate boundaries. Unlike Nestlé S.A., which places SBU oversight with Nestec personnel, senior executives of Cadbury operating entities double as *both* the leaders of business units *and* as the heads of production activities. For example, Chambers simultaneously serves as the CEO of Cadbury USA and as the head of Cadbury's American Confectionary business unit.[53] He is accountable for all

---

[52]Cadbury USA is not a party to the actions before the court; however, a plaintiff seeking to acquire alter ego jurisdiction over a foreign parent need not join its domestic subsidiary to the action. See Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp., 751 F.2d 117, 119, 122-23 (2d Cir. 1984) (opining that alter ego jurisdiction existed over foreign party corporation by virtue of its control of a non-party subsidiary); Bellomo v. Pa. Life Co., 488 F. Supp. 744, 746-47 (S.D.N.Y. 1980) (exercising agency jurisdiction over an out-of-forum parent based upon the forum-related activities of its non-party subsidiaries). The alter ego relationship effectively places the parent within the forum, rendering formal joinder of the subsidiary unnecessary.

[53]It is unclear whether the American Confectionary division is a distinct corporate entity or whether the term merely refers to all Cadbury confectionary-producing entities in the United States and Canada. Chambers testified that he joined the Cadbury group in 2005 as the "CEO of Americas Confectionary," (Doc. 620, Ex. 4 at 9); however, a subsequent affidavit avers that his employer was Cadbury USA, (Doc. 629, Ex. 2 ¶ 4). During his deposition, he explained that "Americas Confectionery was the internal organization name for the Americas Region in the Confectionery side of the business." (Doc. 620, Ex. 4 at 15.) Prior to 2008, Americas Confectionary consisted of three regions: South America, northern Latin America, and North America. (Id. at 46.) Each of these regions had a president who reported directly to Chambers. In 2008, the division was reshaped and currently comprises five smaller regions, to wit: the U.S., Canada, Mexico, Central America, and the Caribbean. (Id. at 47.) It is unclear whether a separate subsidiary corporation operates in each of these regions or whether such entities—if they exist—scrupulously observe corporate boundaries.

confectionaries produced in the United States, Canada, and Mexico regardless of

whether Cadbury USA actually manufactures them.  (Doc. 620, Ex. 4 at 63-66.)

Chambers also holds membership on the CEC, which exercises centralized control

over "the day-to-day management" of all Cadbury entities.  (Doc. 521, Ex. B.)  In

effect, Cadbury plc and Cadbury Holdings have conscripted employees of their

subsidiaries to discharge group-wide management functions across corporate

boundaries.  These dual responsibilities of senior executives provide strong

evidence of an alter ego relationship.  See, e.g., Cali v. E. Coast Aviation Servs., Ltd.,

178 F. Supp. 2d 276, 289 (E.D.N.Y. 2001) (relying upon vertical integration of parent

and subsidiary corporations through business units to exercise alter ego

jurisdiction); Latex Gloves, 2001 WL 964105, at *6 (same).

---

Similar confusion persists regarding the recruitment and assignment of employees within the Cadbury group.  For example, Todd Stitzer, the CEO of Cadbury plc, is "actually employed *by [a] US company* and then second[ed to] . . . Cadbury Holdings."  (Doc. 620, Ex. 3 at 17 (emphasis added)).  Indeed, most CEC members are employed by Cadbury operating entities despite their participation in the global management functions of the CEC.  Employees often transfer from one Cadbury entity to another based upon the Committee's recommendations. Chambers explained that "the [HR recruitment function] works kind of [amorphously], in terms of business unit to business unit. . . . [T]he supply pool [of personnel] . . . is cultivated by the HR community . . . across all of the entities that . . . make up Cadbury."  (Doc. 620, Ex. 4 at 205.)  The Cadbury group's centralized management of territory and personnel provide prima facie evidence that Cadbury corporate boundaries are superimposed purlieus that do not reflect functional accountabilities within the corporate group.  Cadbury plc and Cadbury Holdings's request that the court defer to corporate parameters is unpersuasive in light of record evidence that defendants themselves failed to accord those lines the same respect.

The CEC meets regularly to assess corporate affairs and implement global strategy. For example, in mid-2007 the CEC discussed the potential for Cadbury USA to increase distribution of Green & Black's, a line of high-end organic chocolate bars. (Doc. 620, Ex. 39 ¶ 5.) The CEC addressed the manner in which profits and losses would be apportioned between Cadbury USA and its English parent corporations, and Cadbury plc's CEO and CFO were required to give the "[f]inal go-ahead" before Cadbury USA could implement the project. (Id.) Minutes of the same meeting reflect that the CEC evaluated market research and issues of supply chain management. (Id. ¶¶ 6-7.) Typically, such functions are discharged by an operating company, yet Cadbury plc and Cadbury Holdings managed these matters through the CEC. See, e.g., Dalton v. R&W Marine, Inc., 897 F.2d 1359, 1363 (5th Cir. 1990) (observing that in a typical corporate family, subsidiaries exercise authority over research, marketing, and supply functions).

The CEC also controls the daily functions of Cadbury operating entities to the exclusion of their respective boards of directors. In fact, Chambers could not recall how many individuals comprise Cadbury USA's board, could not identify a single board member, and could not remember attending any board meetings in

person.[54]  In contrast, he recollected attending meetings of the Cadbury Schweppes

board on two occasions, (Doc. 620, Ex. 4 at 92), and he recounted active

participation in CEC meetings.  Chambers also recalled numerous instances in

which the CEC issued decisions that affected the operational activities of Cadbury

USA.  He stated that the CEC convenes between six and nine times annually, (id.

at 60), that members discuss advertising campaigns, executive recruitment, and

outsourcing, (id. at 69-70, 103), that meetings ordinarily last between one and three

days, (id. at 95), and that the CEC often reviews investor relations activities, (id.

---

[54]Chambers testified as follows:

| | |
|---|---|
| Q. | How many members are on the board of directors of Cadbury Adams USA? |
| A. | I don't know exactly. |
| Q. | Approximately? |
| A. | Half-a-dozen. |
| Q . | Do you know who they are? |
| A. | I couldn't list them all, no. |
| Q . | Can you list any of them? |
| A. | Not with certainty, no. |
| Q. | Have you ever met with the board of directors of Cadbury Adams USA? |
| A. | We have had meetings or documents that would act as a meeting, to come to an agreement on issues. |
| Q . | You're talking about something that was done on a paper basis, correct? |
| A . | That's part of what I'm referring to, yes. |
| Q. | Have you ever had an in-person meeting with the board of directors of Cadbury Adams USA? |
| A. | I don't recall. |
| Q. | Have you ever participated in a telephonic meeting with members of the board of directors of Cadbury Adams USA? |
| A. | I don't recall. |

(Doc. 620, Ex. 4 at 93-94.)

at 178-79). These common operational functions occur under the direction of Cadbury plc and Cadbury Holdings. As the CEO of Cadbury USA, Chambers's inability to describe the role of his company's board while testifying at length about the operational activities of the CEC strongly suggests that Cadbury plc and Cadbury Holdings control the actions of their subsidiaries to the exclusion of those companies' boards of directors.[55]

Plaintiffs' prima facie alter ego evidence succeeds against Cadbury plc and Cadbury Holdings where it failed against Mars Canada and Nestlé S.A. for several reasons. First, the Mars and Nestlé groups have no entity analogous to the Cadbury CEC. The executives of Cadbury operating subsidiaries declare group-wide strategy across corporate boundaries through their positions on the Committee. Mars Global and Nestlé S.A., in contrast, limit their involvement in subsidiary affairs to establishing broad corporate policies through mediums such as the Mars Finance Manual and Nestec's licensing agreements. Second, Cadbury's business units exercise greater control over operating activities than the Nestlé group's

---

[55]Following his deposition, Chambers executed an affidavit identifying the members of Cadbury USA's board as himself, Brad Irwin, Gary Lyons, and James Reed. (Doc. 629, Ex. 2 ¶ 4.) He also enumerated four board meetings and ten written consents in which he participated. (Id. ¶ 3; Doc. 629, Ex. 2A.) These late-breaking recollections are insufficient to countermand Chambers's description of the centralized control that the CEC exercises over Cadbury USA. Chambers expressed familiarity with Reed during his deposition, and Lyons, who is Cadbury USA's general counsel, was physically present during his testimony. (Doc. 620, Ex. 4 at 2, 204.) Chambers's failure to identify these individuals as board members despite professional relationships with them underscores the board's lack of operational control.

SBUs and SGDU.  Whereas Nestec configures SBUs differently from Nestlé operating entities, Cadbury business units are uniform from the canopy to the root of the corporate family tree.  Finally, Mars Canada and Nestlé Canada possess greater corporate independence than does Cadbury USA.  Mars Canada exercises considerable influence over the dividends and repatriations that it pays to Mars Global, and Nestlé USA has established an American business strategy without Nestlé S.A.'s superintendence, (Doc. 618, Ex. 19).  Cadbury USA exercises no similar measure of autonomy.

Plaintiffs have proffered prima facie evidence that Cadbury USA acts as the alter ego of Cadbury plc and Cadbury Holdings.  In light of its physical presence within the United States, the court may exercise general jurisdiction over Cadbury plc and Cadbury Holdings based upon this alter ego relationship.[56, 57]

_____

[56]In light of plaintiffs' showing of an alter ego relationship, the court need not consider whether Cadbury plc and Cadbury Holdings possess systematic and continuous contacts with the United States or whether they are otherwise subject to the court's specific jurisdiction.

[57]Retaining Cadbury plc and Cadbury Holdings while dismissing the remaining Rule 12(b)(2) defendants is consistent with recent Third Circuit pronouncements applying the doctrine of general jurisdiction.  D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd., 566 F.3d 94 (3d Cir. 2009), illustrates that purposeful engagement of in-forum residents is essential to the exercise of general jurisdiction.  In D'Jamoos, plaintiff brought suit against a Swiss corporation engaged in the production of aircraft.  Id. at 98.  The manufacturer maintained a stateside subsidiary, which acted as its exclusive distributor in the United States, performed final manufacturing work on aircraft sold here, and performed research and development functions for the foreign parent.  Id. at 98, 107-08.  The parent incorporated alterations designed by the subsidiary into new versions of its aircraft, and approximately half of the parent's total revenue derived from the subsidiary's sales in the U.S. Id. at 108.  The Third Circuit held that the parent's activity

C.    **Fairness and Substantial Justice**

A defendant's contacts with a forum are not alone sufficient to enable the

court to exercise personal jurisdiction, and the court must also ensure that

proceeding with the lawsuit harmonizes with "traditional notions of fair play and

---

constituted a mutual, ongoing business relationship with the subsidiary in the forum:  The parent supplied the subsidiary with a steady stream of aircraft; the subsidiary's *"raison d'être* [was] 'to provide completions, marketing, sales, and service for [the parent]."  Id.  The parent engaged primarily in manufacturing activity; the subsidiary provided a considerable outlet for its products and a platform to research product improvements.  Moreover, the subsidiary acted as the final artery through which the parent channeled its products to American consumers.  The Third Circuit concluded that the parent was the subsidiary's sole "source of life," and that its activities amounted to the business of the parent.  Id. at 109.

Mars Global and Nestlé S.A. do not exercise such extensive control over Mars Canada and Nestlé USA.  Both of these subsidiaries manage their own operations and develop marketing campaigns for local markets.  The parent entities advise and monitor subsidiary performance but do not manufacture products or inject their presence into daily operational affairs.  In contrast, Cadbury plc and Cadbury Holdings exercise sweeping control over their subsidiaries through the CEC.  The Committee, comprised of the heads of business units, directly manages production and product development.  Cadbury operating entities therefore draw life from their corporate parent in a manner not shared by their Mars and Nestlé counterparts, and D'Jamoos bolsters the court's dismissal of the latter entities while exercising jurisdiction over Cadbury plc and Cadbury Holdings.

substantial justice."[58] <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945).

Factors influencing this analysis include (1) the burden to defendant of litigating in the forum, (2) the forum's interest in adjudicating the lawsuit, (3) "the plaintiff's interest obtaining convenient and effective relief," (4) the interstate judicial system's interest in resolving conflicts efficiently, and (5) "the shared interest of the several states in furthering fundamental substantive social policies." <u>Pennzoil Prods. Co. v. Colelli & Assocs.</u>, 149 F.3d 197, 205-06 (3d Cir. 1998) (quoting <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 477 (1985)).  In federal question cases, the final two factors focus less upon federalism concerns and more upon the national interests underlying the statutes that create the plaintiff's claim.  <u>Pinker</u>, 292 F.3d at 371-72.  The court must afford particular care to the interests of a foreign defendant, who may shoulder a heavy burden by defending itself in a legal system with which it lacks familiarity.  <u>See</u> <u>Asahi Metal Indus. Co. v. Superior Court</u>, 480 U.S. 102, 114 (1987); <u>O'Connor v. Sandy Lane Hotel Co.</u>, 496 F.3d 312, 324 (3d Cir. 2007).

---

[58]Considerations of fairness and substantial justice typically arise in the context of specific jurisdiction, and the Supreme Court has never expressly applied them to the general jurisdiction analysis.  4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE, § 1067.5, at 521-23 (3d ed. 2002). Nonetheless, several courts of appeals have instructed that such factors properly bear on the issue of general jurisdiction and the court will therefore assess them in this case.  <u>Id.</u>; <u>see also</u> <u>Trierweiler v. Croxton & Trench Holding Corp.</u>, 90 F.3d 1523, 1532-33 (10th Cir. 1996); <u>Metro. Life Ins. Co. v. Roberson-Ceco Corp.</u>, 84 F.3d 560, 568, 573 (2d Cir. 1996); <u>Amoco Egypt Oil Co. v. Leonis Navigation Co.</u>, 1 F.3d 848, 851 (9th Cir. 1993); <u>accord</u> <u>Lehigh Coal & Navigation Co. v. Geko-Mayo, GmbH</u>, 56 F. Supp. 2d 559, 570 (E.D. Pa. 1999); <u>Amp, Inc. v. Methode Elecs., Inc.</u>, 823 F. Supp. 259, 262 (M.D. Pa. 1993).

In the present matter, these factors favor exercising jurisdiction over Cadbury plc and Cadbury Holdings despite their status as foreign corporations. These defendants and their predecessor, Cadbury Schweppes, have frequently convened meetings of their boards of directors and of the CEC within the territory of the United States, and Chambers—who is based in the U.S.—provides leadership and guidance to the parent organizations in the United Kingdom. Stitzer, the CEO of the Cadbury group, is employed by a U.S. entity. Cadbury plc and Cadbury Holdings regularly interact with the American market through the CEC and through the sharing of employees via the seconding process. Despite their foreign status, litigation before an American tribunal will not impose an unduly severe burden upon them.

The nature of plaintiffs' claim further supports exercise of jurisdiction over these defendants. Plaintiffs allege violations of U.S. antitrust laws. Plaintiffs have an interest in bringing these claims before an American court. The United States has a similar interest in efficiently and effectively resolving such suits before the federal judiciary. Moreover, the national interest in enforcing the policies of free market competition that underlie the Sherman Act favor proceeding with plaintiffs' claims against Cadbury plc and Cadbury Holdings. The court concludes that

exercising jurisdiction over these defendants comports with "traditional notions of fair play and substantial justice." Int'l Shoe, 326 U.S. at 316.[59]

## IV.    Conclusion

Mars Canada and Nestlé S.A. do not maintain an alter ego relationship with their affiliated American entities, nor do they possess systematic and continuous contacts with the United States in their own rite. Mars Canada likewise maintains no business presence here. These defendants' motions to dismiss for lack of personal jurisdiction will be granted, and their Rule 12(b)(6) motions will be denied as moot.

Plaintiffs have made a prima facie showing that Cadbury plc and Cadbury Holdings control Cadbury USA to such an extent that it acts as their alter ego. Their jurisdictional motion will be denied, and the court will also deny their Rule 12(b)(6) motions for the reasons set forth in the memorandum of court dated March 4, 2009. See Chocolate I, 602 F. Supp. 2d at 574-78.

An appropriate order follows.

S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Dated:      August 11, 2009

---

[59]Cadbury plc and Cadbury Holdings have filed three motions (Docs. 464, 469, 476) to dismiss plaintiffs amended complaints for failure to state a claim upon which relief can be granted. The court considered the arguments raised therein when ruling upon the Rule 12(b)(6) motions of the defendants that did not contest personal jurisdiction. The court will deny Cadbury plc and Cadbury Holdings's Rule 12(b)(6) motions for reasons identical to those set forth in Chocolate I. See 602 F. Supp. 2d 574-58.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: CHOCOLATE | : | MDL DOCKET NO. 1935 |
| CONFECTIONARY ANTITRUST | : | (Civil Action No. 1:08-MDL-1935) |
| LITIGATION | : | |
| _____ | : | (Judge Conner) |
| | : | |
| THIS DOCUMENT APPLIES TO: | : | |
| | : | |
| ALL CASES | : | |

## ORDER

AND NOW, this 11th day of August, 2009, upon consideration of the motions

to dismiss (Docs. 464, 466, 469, 471, 473, 474, 476), and for the reasons set forth in the

accompanying memorandum, it is hereby ORDERED that:

1. The motions to dismiss (Docs. 471, 473, 474) pursuant to Rule 12(b)(2) filed by Mars Canada, Nestlé S.A. and Nestlé Canada are GRANTED.

2. The motion to dismiss (Doc. 466) pursuant to Rule 12(b)(2) filed by Cadbury plc and Cadbury Holdings is DENIED.

3. The motion to dismiss (Doc. 469) the amended complaints of the indirect end users and the indirect purchasers for resale pursuant to Rule 12(b)(6) is DENIED in part and DENIED as moot in part as follows:

   a. The motion is DENIED with respect to Cadbury plc and Cadbury Holdings.

   b. The motion is DENIED as moot with respect to Mars Canada, Nestlé S.A., and Nestlé Canada.

4. The motion to dismiss (Doc. 476) the amended complaints of the direct purchasers and individual plaintiffs pursuant to Rule 12(b)(6) is DENIED in part and DENIED as moot in part as follows:

   a. The motion is DENIED with respect to Cadbury plc and Cadbury Holdings.

   b. The motion is DENIED as moot with respect to Mars Canada, Nestlé S.A., and Nestlé Canada.

5. The motion to dismiss (Doc. 464) pursuant to Rule 12(b)(6) filed by Cadbury plc and Cadbury Holdings is DENIED.


   S/ Christopher C. Conner
   CHRISTOPHER C. CONNER
   United States District Judge